### DICK WELBORN v. THE STATE.

No. 3739.   Decided November 3, 1915.

**Murder—Manslaughter—Charge of Court—Self-defense—Standpoint of Defendant.**

Where, upon trial of murder and a conviction of manslaughter, the trial court failed to define these offenses, and limited defendant's right to defend

himself by the deceased and others instead of defending himself against the deceased, or against the deceased and others, whether they had formed a conspiracy or not, and assumed certain facts, and was not clear with reference to defendant's attitude, viewed from his standpoint of the case, the same was reversible error.

Appeal from the District Court of Houston. Tried below before the Hon. John S. Prince.

Appeal from a conviction of manslaughter; penalty, four years imprisonment in the penitentiary.

The opinion states the case.

C. McClain, John I. Moore, and N. B. Morris, for appellant.—On question of charge of court: Cartwright v. State, 16 Texas Crim. App., 473; Francis v. State, 55 S. W. Rep., 488; Stacy v. State, 48 Texas Crim. Rep., 95.

C. C. McDonald, Assistant Attorney General, for the State.

DAVIDSON, JUDGE.—Appellant was allotted four years in the penitentiary for manslaughter.

In a general way, without being prolix, the evidence shows that some fifteen years or such matter before this unfortunate difficulty, appellant was charged with killing the father of the deceased. For this he was acquitted, and on this trial he testified he did not kill the father of the deceased, Marshall English; that he did not even have a fight with him. The theory of the State was that appellant, having been indicted for the killing of the father of Marshall English, and because perhaps he may have been guilty of that offense, he, therefore, wanted to kill and did kill Marshall English. A Mr. Pluncket was teaching a singing school in the community where the Englishes resided, and also in the community where the defendant resided. These places were something like seven miles apart. Just before the killing, Pluncket was in defendant's community and invited the people there generally, including the defendant and his family, to attend the singing school in the English community on a particular day, which invitation defendant and his family accepted and attended that meeting. It seems to have been the closing exercises of that singing school. There were several members of the English family present at the time of the homicide, but were not members of either singing school, nor had they attended either. When appellant was on his way to the singing school where the difficulty occurred, there is evidence tending to show that one of the English boys saw appellant and his family. The singing school went on without any trouble until some time after the dinner or noon hour. Everything was pleasant and quiet until about 4 o'clock, or a little thereafter. The singing school adjourned. Marshall English and his friends and kinsfolk were in and about the schoolhouse, mainly dressed in their working clothes. It is shown they were about the doors and windows, and the theory of the defendant was they were

locating appellant, of all of which he seems to have been ignorant. After the benediction was pronounced, and while appellant was near the rostrum, Marshall English and one of his companions entered the side door, and the difficulty immediately ensued. The evidence is in conflict as to who began this difficulty. Appellant and his witnesses say that Marshall English caught appellant by the collar and began beating him in the face, crowded him back on the rostrum, threw him to the floor, got on him, and another of the English family friends came into the front door and shot appellant while the others were yet on him. The State's witnesses contend that appellant began the difficulty by striking Marshall English in the face, and that appellant shot English before anybody shot him. The contradictions and conflicts of the testimony of this case are rather peculiar. The State's theory, in addition to what has been above stated, was that appellant was standing in the house and Marshall English and one of his friends entered and passed near where he was, and appellant struck him; that Marshall English, the deceased, then struck him, and a fight ensued between them in which appellant pushed English back to the rostrum and during the trouble shot him twice, once in the leg and once in the body. Appellant's side of the case was that he was standing at the designated spot when deceased and a friend entered and deceased struck him, and the fight ensued, and that they pushed him back against the rostrum and onto it, and had him down and were beating him; that there were four, five or six of the Englishes and their friends engaged in the difficulty, and Marshall English was on him. Some of the testimony goes to show that Marshall English when shot was standing up bending down over appellant and beating him. Appellant says in this condition that he was shot by one of them, and that he immediately got his pistol out and fired two shots rapidly. The evidence for the State controverts this, as before stated, and shows all of these people were not on him. One of the State's witnesses, however, testified that he ran up, jerked his pistol and struck appellant over the head once or twice as hard as he could hit him, and that the pistol by force of the jars was discharged and he supposed struck appellant. There is a great deal of testimony as to the relative size of the parties, but it may be fairly stated that deceased was a larger man and stronger and much younger than appellant, the deceased being twenty-five to twenty-eight years of age, and appellant about fifty, and weighed 128 pounds, while deceased weighed considerably more.

Taking into consideration all these conflicts as to the relative size of the parties, and the number of parties engaged in the difficulty at the time of the homicide, there are some facts that might be mentioned under the evidence still more peculiar. The clothing worn by appellant—shirt and undershirt—were introduced in evidence before the jury to show the position of the holes which correspond with the holes in appellant's body as to where he was shot. His wife testified that she looked at him and examined him, and saw the doctor examine him. She says he was so bloody she did not recognize him at once, and did

not know her husband was engaged in a difficulty until she noticed his clothing, and then she discovered the fact that it was her husband. She, with quite a lot of other witnesses, testified that the first gun fired was from the English party, and that the other shots followed from the man on the floor, who she afterward ascertained to be her husband. That immediately upon ascertaining it was her husband she asked him what was the matter. His reply was, "Ben James and Marshall English have tried to kill me." "I said, 'Mercy sakes, what is the matter?' and he said, 'Ben James and Marshall English have tried to kill me.'" Ben James is the party who struck with the pistol. She describes the wounds on appellant, and said she saw the doctor probe and examine the bullet wounds. One bullet entered his chin, went through his jaw, and came out through his lip; that it came through his mouth and scorched his lip and tongue; that his tongue was burned. The other bullet entered the left side right at the waist line and "came out by the breast." The doctor probed for the bullet and found that it went out that way. In further describing the wound she said she found the hole in the shirt and in the undershirt, and the position of the holes corresponded with the holes in his body. This shirt and undershirt were introduced before the jury. She says her husband was cut across the face with a knife; that it looked like it was nearly to the bone, and across the nose there was a knife cut. When the doctor dressed the bullet wounds he also dressed these other wounds. He had a good many bruises on him, and it is also shown there were two scalp wounds on his head; one was closed with five stitches and the other with three stitches. All the evidence indicates that he was very bloody when he emerged from the combat. The State introduced evidence and contended that the original fight occurred only between Marshall English and the defendant, and that Ben James and the others got into it subsequently, and disclaimed using a knife, and that after James struck appellant twice with his pistol on the head and the pistol was discharged in this way, that he then became engaged in a contest with the son of appellant over the pistol. So it will be observed that the testimony is very wide apart as to how this transaction occurred. If appellant was shot through the jaw and the mouth as testified to, and in the side, he must have been shot twice, yet the bulk of this testimony shows there were but three shots fired. It is seldom the case that a record comes before this court where the evidence is so variant and conflicting by eyewitnesses as shown by this record. This much of the testimony is collated in order to bring in review the court's charge, exceptions thereto, and special instructions requested.

There is no definition of manslaughter or murder contained in the charge of the court. The court informs the jury, "The indictment embraces both murder and manslaughter." Then follows this charge: "If you believe from the evidence, beyond a reasonable doubt, that the defendant began the difficulty with the intention of killing the deceased, he would be guilty of murder, and if you believe he begun it with an intention less than to take the life of deceased, he would be guilty of

manslaughter. And if you believe, beyond a reasonable doubt, that he begun the difficulty, but have a doubt as to his intentions you will give him the benefit of the doubt and convict him of manslaughter, subject to the succeeding paragraph of this charge." Then follows the punishment for murder and manslaughter. Then he gave what he termed in the charge "succeeding paragraph": "If the deceased and others had formed a conspiracy to kill the defendant, or inflict upon him serious bodily harm, and begun the difficulty, or if it reasonably appeared to the defendant that they were about to begin the difficulty, then the defendant had the right to make the attack, and to shoot and kill the deceased.

"If you believe that the deceased begun the difficulty by making an assault on the defendant with his fist and that before anyone else interfered in the difficulty (if they did interfere in the difficulty) the defendant shot and killed deceased, he would be guilty of manslaughter, but if others acting with deceased attacked defendant, or from their acts and conduct, taken in connection with the assault by deceased, and all other circumstances in this case, it reasonably appeared to the defendant, viewing from his standpoint, that others were about to attack him, and under such circumstances he shot and killed deceased, then you will acquit him." Then follows a charge on dying declaration.

Appellant asked the following special charge: "In passing upon the issue of self-defense in this case, you must view the situation from the standpoint of the defendant alone and from no other standpoint." This was given. Another special charge was asked, which we suppose was given, as follows: "If you believe from the testimony that the defendant was shot and that it was done accidentally, you are instructed that if he believed it was purposely done he would have the same benefit of the law of self-defense under the circumstances that he would have if it was done purposely." Another charge was given at request of appellant, which is as follows: "If deceased attacked the defendant and was assaulting him so violently as to warrant in his mind a reasonable apprehension or fear of serious bodily harm, and, so fearing he shot and killed the deceased to save himself from such serious bodily harm, then you will acquit the defendant, although you might find that no other person or persons were assaulting him at the time he fired the fatal shot." He asked another special charge, which was refused, as follows: "The defendant's perfect right of self-defense does not depend upon an actual conspiracy on the part of the deceased and others to inflict upon him serious bodily harm, but if he believed at the time that he was in danger of serious bodily harm from any one or more, viewing the case from his standpoint, as it appeared to him at the time, then he would have a right to anticipate such attack and act in his own defense, and if he did so and in the difficulty ensuing killed the deceased, or if you have a reasonable doubt thereof, then you will acquit him."

One objection to the charge at the time it was given, before being

read to the jury, was to that part of the charge quoted above which is denominated in the previous portion of this opinion as the "succeeding paragraph." The objection was that it limits the defendant's right to defend himself against an attack of the deceased and others if they had formed a conspiracy to kill or inflict serious bodily harm upon him; because said charge limits the defendant's right of self-defense to an attack not by the deceased alone, but by the deceased and others, and that, too, after they had formed a conspiracy to do serious bodily harm to him or kill him, whereas under the law he would have the right to defend himself against the deceased or against the deceased and others whether they had formed a conspiracy to injure him or not, and because said charge limits his right of self-defense under the circumstances of this case. He also objected to that portion of the charge which instructed the jury, as already heretofore set out, "If you believe that the deceased begun the difficulty by making an assault on the defendant with his fist and that before anyone else interfered in the difficulty," etc., he would be guilty of manslaughter, but if others, acting with deceased, attacked defendant, or from their acts and conduct, taken in connection with the assault by deceased, and all other circumstances in this case, it reasonably appeared to defendant, viewing from his standpoint, that others were about to attack him, then they would acquit. The objection urged to this charge was that it deprived defendant of any right to defend himself against an unlawful attack upon him by the deceased alone, while the evidence tended to show and which would have been sustained as a fact, that the defendant was at the time of the difficulty over fifty years of age and weighed about 128 pounds, whereas the deceased was shown to have been at that time a robust, athletic young man about twenty-eight years old, weighing about 155 to 160 pounds, and, therefore, able to inflict upon defendant serious bodily harm without the use of any weapons, and defendant contends that he should have the perfect right of self-defense against said deceased without being limited. The court qualifies this by stating that "the defendant was forty-nine years old and weighed 128 pounds; that deceased was twenty-eight years old and weighed 150 or 160 pounds, was delicate, weak and 'weasley,' but could walk without a stick or crutch. There was no proof that deceased was a man of superior strength to defendant." He further qualifies it by stating that "The State's evidence showed that defendant and deceased were both on their feet—standing up—when the two fatal shots were fired. That defendant had been attacked by deceased and others beating him, also, that still another had shot him, and that he then fired in self-defense. So there was no middle ground—besides this paragraph complained of was expressly modified by defendant's special charge No. 1." There was another charge given by the court with reference to the deceased striking appellant with his fist, which is qualified by the judge in the same way. This charge informed the jury that, if the deceased began the difficulty by striking defendant with his fist and that before anyone else interfered in the difficulty

the defendant shot and killed deceased, he would be guilty of manslaughter, but if others acting with deceased attacked defendant, or from their acts and conduct, taken in connection with the assault by deceased, and all other circumstances in the case, it reasonably appeared to the defendant, viewing it from his standpoint, that others were about to attack him, and under such circumstances he shot and killed deceased, he would not be guilty.

On account of the peculiar construction and wording of the charge given by the court, it has been deemed necessary to make a more detailed statement of these charges given and refused than would otherwise be required. It will be noticed that the first charge starts out upon the assumption that the defendant struck the deceased first. That if defendant did it for the purpose of provoking a difficulty to kill, he would be guilty of murder; if not to kill, he would be guilty of manslaughter. There is no definition given of murder or manslaughter. So the remainder of the charge seems to be a confused statement and not a clear enunciation of law as to the rights of the defendant if he killed the deceased Marshall English because he thought his life was in danger, or his body of serious bodily harm, independent of the acts of others. Nor is the charge clear as to the relation of the conspiracy phase of it to defendant's right. As has been heretofore noticed, it would be difficult to imagine a state of facts more confused and more in conflict than this record shows. Appellant's theory was, he was standing quietly smoking, and in this he is borne out by much of the testimony, when deceased, Marshall English, approached him, or in passing by him struck him on the face, and some witnesses say on the neck. This brought about the difficulty. Marshall English being somewhat stronger, more vigorous and much younger and having advantage of appellant he got him down on the floor and was beating him, and while in this condition there was a pistol fired, and appellant says he immediately fired two shots. If appellant killed the deceased, Marshall English, because, from his viewpoint of it, his life was in danger or his body of serious bodily injury, he had a right to shoot, and to shoot until he relieved himself of impending danger, whether the other parties had anything to do with the trouble or not, or when they came into the difficulty. But be that as it may, he had a right to have this question of self-defense presented to the jury, from the acts and conduct and relation of himself to the deceased, and the deceased's relation to him from that standpoint. There is testimony also that enhances his view and may have impressed itself upon defendant's idea of environment that these parties were there to have trouble, and that Marshall English, the deceased, and others went in to bring it on, and the others to join in later if necessary. If anticipating this he killed English before the others came into it, while he was in danger of serious bodily injury, he would have the perfect right of self-defense from this standpoint. If, as another phase of the testimony shows, while he was down and they were beating him, a pistol fired and he was shot, certainly he had the perfect right of self-defense from the attack of more than one.

It was not definitely so charged to the jury, and his right of self-defense was limited in this respect. It is true if he killed to resist the acts of the conspirators, he would not be guilty, but defendant had a right to resist all danger of his life or serious bodily injury from the standpoint of English's attack under the circumstances of this case. He had a right to view it in the light of a conspiracy, and that Marshall English was to bring it on, and he had a right to kill him before all conspiring parties attacked him. His right of self-defense would be perfect if he was attacked by more than one of these parties under the circumstances already detailed. These matters were not submitted to the jury as they should have been.

The charge is not clear again as it might be with reference to defendant's attitude, viewed from his standpoint of the case. The keynote and controlling thought and central point in the question of self-defense is to be viewed from the standpoint of the defendant, not as the other side viewed it, but as defendant viewed it. Again, it is his viewpoint of it, and not the viewpoint of the jury as they see it subsequent to the homicide. Defendant has a right to have his side submitted as he viewed it at the time of the transaction. He could not look at the transaction in the light of what might occur afterwards, nor could he look at it in any light of prior occurrences, unless those prior occurrences were in some way brought to his attention directly or indirectly. These are general and usually correctly stated rules. It is unnecessary to go over this case further. Enough has been said to indicate that the defendant must have the law applied to the facts of his case, and the jury must be given a true and correct criterion by which to decide his rights and his connection with these matters.

The judgment is reversed and the cause remanded.

*Reversed and remanded.*