Veola Bradley BRADFORD, Indiv. and as Temp. Admx. of Estate of Roger Glenn Bradley, Dec., Appellant,

v.

FORT WORTH TRANSIT COMPANY, Inc., et al., Appellees.

No. 17080.

Court of Civil Appeals of Texas, Fort Worth.

Jan. 30, 1970.

Rehearing Denied Feb. 27, 1970.

Hooper & Kerry, and Michael R. Burkett, Fort Worth, for appellant.

Aultman & Riley, and Randell C. Riley, Fort Worth, for appellee, Olan W. Dyson.

Cantey, Hanger, Gooch, Cravens & Munn, and William L. Hughes, Jr., Fort Worth, for appellee, Fort Worth Transit Co., Inc.

## OPINION

LANGDON, Justice.

The appellant initiated suit against appellees, Fort Worth Transit Company, Inc. and its driver, Olan W. Dyson, under the wrongful death statute following the shooting of her son, Roger Glenn Bradley. Appellees alleged that the shooting was done in self-defense and that deceased was negligent in several respects which would bar recovery. The case was tried to a jury. Judgment based upon the findings of the jury was rendered for the appellees.

The appellant's appeal from such judgment is based upon five points of error as follows:

The trial court erred in submitting Special Issue No. 81 because it placed the burden of proof of negating self-defense on the plaintiff and it assumed and informed the jury that Roger Glenn Bradley and Randolph Brown were acting in concert. (Points 1 and 2.) The verdict is contrary to and is not supported by the evidence. (Points 3 and 4.) The verdict of the jury was the result of passion and prejudice. (Point 5.)

We affirm.

The facts involve events occurring on two successive evenings aboard a bus owned by Fort Worth Transit Company and driven on both occasions by its employee, Dyson.

The deceased was one of several teenage high school boys who were passengers on the bus from downtown Fort Worth to the southeast section of the city on both evenings. Difficulty was first encountered on Tuesday evening when Randolph Brown, one of the teenagers on the bus, attempted to molest a female passenger. The difficulty carried over to the following evening when Randolph Brown, in company with other teenage youths, went to the front of the bus and committed an assault on the driver with his hands and a knife. Immediately following the assault upon him, Dyson fired pistol shots, one of which struck the deceased. The jury found that the deceased was a "principal" in the attack on the driver Dyson and was negligent in several respects.

Special Issue No. 81 and the instruction given in connection therewith is, except for the names of the parties, identical with the issue and instruction which was approved by the Supreme Court in the case of Grieger v. Vega, 153 Tex. 498, 271 S. W.2d 85 (1954). The situation in Grieger is very similar to the one in this case.

Special Issue No. 81, complained of on this appeal, read: "Do you find from a preponderance of the evidence that the action of Olan W. Dyson in shooting the deceased Roger Glenn Bradley was wrongful? Answer 'Yes' or 'No.'" The jury answered "No."

Special Issue No. 1 in the Grieger case (also answered "No") was identical to the above issue except it contained the phrase, "shooting and killing" rather than the word "shooting" as employed in Issue No. 81. The term "wrongful" was defined in connection with Special Issue No. 81 in this case in language identical to that used in Grieger except for the parties. The latter (Grieger) employed the phrase "deceased or his brother." In the instant case the phrase "deceased or Randolph Brown"

was substituted. Otherwise the instruction was the same.

The Grieger case commended the manner of submission. At page 89 of 271 S. W.2d it was said: "* * * The sole right of respondent to recover damages is derived from the statute, Article 4671. That right did not exist at common law. The statute gives such a right when death 'is caused by the wrongful act, neglect, carelessness, unskilfulness, or default of another'. It will be observed that 'wrongful act' is placed in the same category as the other grounds giving rise to a cause of action, from which it follows that the burden placed upon plaintiff to prove the death was caused by a 'wrongful act' is the same as that for death by negligence or any of the other grounds named."

On page 90 of the Grieger case appears the following: "(11, 12) We agree with the conclusions in those cases, but not upon the ground that the burden of proof shifts from one party to another during the trial. It remains throughout on the plaintiff. When defendant's evidence raises an issue of justification, the presumption that the killing was wrongful is balanced, and the matter is set at large. The plaintiff can then no longer rely alone upon the presumption, but must prove the wrong by a preponderance of the evidence", and "(13) In establishing her case the respondent's witnesses testified to facts regarding the killing, from which facts the jury might well have based a finding of justification. Had the case been closed when she rested, this situation would have been presented: Petitioner intentionally killed respondent's son; such killing may have been wrongful, but, on the other hand, it may have been justified. The burden surely did not rest upon petitioner to prove that it was not wrongful, but was upon the respondent to prove that it was wrongful."

Three members of the present Supreme Court were among the majority of the court which approved the holding in the Grieger case in 1954. After more than fifteen years following that opinion the Supreme Court has not overruled the decision nor has the Legislature seen fit to change or alter Art. 4671 so as to remove "wrongful act" from the same category as the other grounds giving rise to a cause of action under such article.

The cases, involving the burden of proving self-defense, relied upon by the appellant are for the most part cases which were decided prior to the Grieger case, supra, which the Supreme Court of Texas handed down in 1954. An exception is Roden v. Booth, 344 S.W.2d 481 (Dallas Civ. App., 1961, writ ref., n. r. e.) which was cited by the appellant.

Reference is made to the Grieger case for the issue and the definition and to the authorities cited therein.

The issues raised by the pleadings and the evidence placed the deceased on the bus during the attack on the driver and in the group around the driver when he was being assaulted.

"It is settled by our decisions that, with the exception of the rule of evidence which gives to a person accused of crime the benefit of a reasonable doubt, the law of self-defense is the same in both civil and criminal cases." Fambrough v. Wagley, 140 Tex. 577, 169 S.W.2d 478, 479 (1943).

Under the law of self-defense it is basic that the attack be viewed from the standpoint of the defendant. This rule has long been followed in the criminal jurisprudence of the State of Texas.

"* * * The key note and controlling thought and central point in the question of self-defense is to be viewed from the standpoint of the defendant, not as the other side viewed it, but as the defendant viewed it. Again, it is his viewpoint of it, and not the viewpoint of the jury as they see it subsequent to the homicide. Defendant has a right to have his

side submitted as he viewed it at the time of the transaction. * * *" Welborn v. State, 78 Tex.Cr.R. 45, 179 S.W. 1179 (1915). See also 28 Tex.Jur.2d 669–672, which notes: "If there appeared to the victim, from his standpoint, a reasonable necessity for taking life, his act may be justifiable; a person is entitled to act on the fair and reasonable appearances of danger, viewed from his standpoint at the time. No man's right to act in self-defense can be limited to his knowledge of danger; the right must always rest on what reasonably appears to him from his standpoint. If it reasonably appears to him that he is in danger of death or serious bodily injury, he may act on such appearances and is justified in killing his assailant. In such circumstances, his belief as to the existence of facts that would justify the killing, and not the truth of the facts, is controlling; the killing may be justified, notwithstanding that the appearances were false and that the danger did not, in fact, exist. The question whether the killing was justifiable is not to be viewed in the light of later events, but by what the defendant reasonably believed at the time."

Article 65, Texas Penal Code, Vernon's Ann., defines "principals" as being those guilty of acting together in the commission of an offense.

Article 66, Texas Penal Code, states: "When an offense is actually committed by one or more persons, but others are present, and knowing the unlawful intent, aid by acts or encourage by words or gestures, those actually engaged in the commission of the unlawful act, or who, not being actually present, keep watch so as to prevent the interruption of those engaged in committing the offense, such persons so aiding, encouraging or keeping watch are principal offenders."

Article 69, Texas Penal Code, states: "Any person who advises or agrees to the commission of an offense and who is present when the same is committed is a principal whether he aid or not in the illegal act."

The record reflects that on the two days involved a group of approximately six teenagers rode the bus being driven by Mr. Dyson. The deceased was 17 years of age. He was described by a friend as being about six feet in height and by his eleventh grade teacher as being about five feet eleven inches in height and weighing about 170 pounds. The autopsy report reflected his height as five feet nine inches and his weight as 150 pounds. At the time of the incident there were six other males in the group identified as Cedric Hill, Don Tatum, Randolph Brown, Gary Clemons, Robert Thomas and Art Norris. Hill described himself as being five feet eleven inches and 165 pounds at the time of the incident. He described Tatum as being six feet two inches in height, Brown as being between five feet ten inches and five feet eleven inches in height, Thomas as being six feet in height, Norris as being five feet seven inches to five feet eight inches in height, and Clemons as about five feet six inches in height.

On the evening preceding the shooting, Dyson stopped the bus while operating on a regular route and cautioned Randolph Brown to stop bothering a female passenger. At the time Brown was in possession of a knife which he had gotten from one of the other boys in the group. Shortly thereafter Dyson stopped the bus at the corner of Quails Lane and Pate Drive to discharge passengers at a regular stop. This was the usual place of departure for the deceased as well as Randolph Brown. When the bus door opened several passengers departed before a group of four or five boys came to the front of the bus. Dyson described what occurred at this point: " * * * I opened the door and two or three people got off—I don't remember the exact number—but this boy and three or four more came up and stopped beside me; I know that there was two standing behind me, and this one boy stopped right in front of me, and then there

was two more standing in the doorway, and the spokesman for the group said something about 'Do you think you can go a little?' and I said 'Well, I could if I had to,' but I said, 'You boys go on and get off the bus; I don't want any trouble with you,' and then he said something about 'Why don't you come on and get off the bus, and let's go a little,' and I said, 'No, I am not getting off the bus,' I said, 'Go ahead and get off the bus; I don't want any more trouble with you,' and I told him this several times, and they kept standing there, and he said, 'What if I am not ready to get off the bus?' Well, I said, 'You are blocking the door, people want off now, go on and get off; I don't want any more trouble with you boys,' * * * and after a few minutes—they kept standing there and after a few minutes they finally got off the bus, laughing among themselves, and when the bus doors cleared I closed the door and drove on."

"* * *

"Q. All right. Now, be absolutely certain about this. 'Only one boy opened his mouth on Tuesday.'

"A. All except one; there was one other boy about that time, while they were talking to me, there was a car drove by and I turned and looked in the direction of this car and this one boy that was standing by the door holding to the handrail looked around and said, 'Go ahead, that aint no police.' "

The occurrence of the first evening is also described in a report of Mr. Dyson which he prepared the following morning. It was offered in evidence by the plaintiff.

On the following evening the same group boarded the bus together in the downtown area. Dyson overheard one of this group say " 'Yeah, that's him.' " It appears from the record that this group wanted to make certain before boarding the bus that Dyson was the driver. When the bus reached the corner of Quails Lane and Pate Drive the group of boys came forward slowly and several stopped by where Dyson was sitting in the front of the bus. The testimony of Dyson would show at this point that he was completely blocked from any avenue of escape from the driver's seat located on the left front corner of the bus. One of the boys accused Dyson of saying he would shoot negroes. Dyson denied it. This boy then cursed Dyson and inquired if Dyson had a gun. He answered in the negative. The boy then began striking Dyson with his fist while shifting a knife from hand to hand. Dyson stated he was unable to flee from the attack because of the position of the driver's seat in the bus. He testified that the knife, described in the record as having a brown handle and a hook blade, was held at his throat and face during the attack. Dyson was struck at least five or six times. He kept asking the boys to leave him alone and get off the bus. He asked some of the other passengers to get the boys off. None responded. During this time a crowd gathered at the side of the bus outside the open door and Mr. Dyson heard one girl yelling "Hit him again." He testified the positions of the other boys on the bus were close enough to touch and they were around where he sat. After the attack the boys backed off the bus to the ground. Mr Dyson immediately got out of his seat and stepped toward the open bus door. He testified he did not want to get caught sitting down in the driver's seat a second time, that he was trying to keep them from coming back on the bus. He pulled a pistol from his shirt as he stepped down on the first step in the bus doorway. He then stepped to the bottom step in the bus doorway and it appeared to him as if the crowd, which was close around the door, was coming back toward the bus door after him. He then fired three shots outside and toward the back of the bus. He then immediately got back into the bus and drove away from the area as fast as possible. Dyson testified the group was from four to ten feet back from the door when he fired. The Medical Examiner estimated the shot which struck the deceased

was fired at a distance of from eight to twelve feet. Shortly thereafter, the police found a long, thin knife on the ground outside the bus within arm's length of the spot where the deceased was shot.

Dyson testified he was scared, afraid for his life and believed he was going to be hurt. The witness Garrett testified she was scared. The witness Ross testified that the driver appeared to be in fear of his life, and that he, Ross, was frightened. The witness Baxendale, who left the bus several blocks before the incident occurred, stated that she was frightened and had never been in a situation like the one which existed aboard the bus. Detective Chandler was told by Dyson shortly after the incident that he, Dyson, hated that it happened but that he was afraid they would kill him. Officer Paul Cook who was the first officer to see Dyson following the incident testified in essence as follows: He seemed like he was more than anything worried over what had happened over the shooting, because he told us at the scene he had been in combat many times in the war and that he might have taken the knife away from the boy if it had not been for the others behind him. He was afraid they would stab him with it. "Q. Speaking of the other boys behind the one with the knife. A. Yes. He was afraid of all of them. He was afraid the others might jump on him."

It clearly appears from the testimony and the evidence in this case that the element of fear existed in the mind of Dyson.

■ There was specific testimony regarding the deceased which is ample to sustain the Court's submission and the jury's finding on Special Issue 81 (wrongful death), Special Issue 82 (principal) and Special Issues 73, 74 and 75 (negligence in standing near the driver during the attack). The deceased sat with Randolph Brown and the other teenage boys on both days. They sat together, sang together and cursed together. Mrs. Baxendale testified that no one of the group seemed to be

more of a leader or more in command of the situation than any other. There was talk among the boys of using a knife to get the guts of a white boy for Christmas. The deceased knew all about the assault which was to occur and was involved in the discussion about it. His friend, Cedric Hill, who left the bus three or four blocks prior to the incident testified in part as follows: "Q. In talking about whether or not Randolph would hit the driver, did you make a statement saying that Roger had said something about 'We don't know what the driver had.'" The witness then explained he was talking about "'We don't know what kind of weapons he's got'", that they were in a discussion right then as to whether or not there was going to be an assault made by Randolph Brown on this driver, and that Bradley made a statement: "'You don't know what he's carrying.'"

The evidence reflects the deceased, Roger Bradley, was wearing a gold sweater and Randolph Brown was wearing a blue and white sweater. No member of this group other than the deceased was wearing a gold sweater. A gold or yellow sweater was offered in evidence as the sweater worn by the deceased. The witness, J. W. Ross, testified substantially as follows: that he would not be positive, but it seemed to him that one of the boys standing up over the bus driver when he was being hit had on a gold sweater. He stated he was not in a position to say that one that was standing up right over him did not have on a gold sweater.

In connection with the gold sweater, Dyson testified:

"Q. All right. What, if anything, at that very minute, after you had driven off and right after you got to Buddies, what, if anything, did you tell the officer with respect to a gold sweater?

"A. I told him that there was one—I told them that the boy that was hitting me had on a gold sweater.

"Q. Will you tell the jury why you thought that?

"A. Because I saw there was one that had on a gold sweater, and I remembered that was one thing that stood out in my memory, that somebody had on a gold sweater, somebody that was there over me and in front of me had on a gold sweater.

"Q. Did you see the gold sweater on the bus while you were being hit?

"A. Yes, I did. It was there in front of me.

"Q. Does that look like the one that you saw (exhibiting a sweater)?

"A. It was one similar to that, yes."

He testified at another point that the gold or yellow colored sweater was on one of the boys in front of him or hovered around him. Further, that at the bus door, as the group crowded around facing the door of the bus he fired in the direction of the gold sweater trying to scare them off because he remembered the gold sweater being up over him in the bus. That he had told the police about the boy in the gold sweater attacking him on the bus before he saw the sweater at the police station.

There was also placed in evidence for the jury's consideration that portion of Dyson's first amended original answer which set forth in detail his contention of self-defense while under joint attack.

■ "Again the law seems to be well settled that, where the contention is there is more than one assailant, the slayer has the legal right to act upon the hostile demonstrations of either, or from any information that leads him to believe that they are acting together against him, if they are present at the time the difficulty is begun and in any way are encouraging, aiding, or advising the real assaulting party, and it so appears to the accused. * * * If there be evidence in the record which, viewed from the defendant's standpoint that he was in danger from more than one assail-

ant, the charge must state that he had the right to defend against all assailants." Black v. State, 65 Tex.Cr.R. 336, 145 S.W. 944, 947 (1912). To the same effect see Jackson v. State, 118 Tex.Cr.R. 448, 39 S.W.2d 63 (1931); Wilson v. State, 140 Tex.Cr.R. 424, 145 S.W.2d 890 (1940); Handy v. State, 136 Tex.Cr.R. 208, 126 S.W.2d 30 (1938); and Stephens v. State, 105 Tex.Cr.R. 161, 287 S.W. 247 (1926).

■ It appears from the above authorities that the trial court correctly worded Special Issue 81 to include self-defense from an attack by either Randolph Brown or the deceased. The pleadings and the evidence supported the submission and the jury's response.

■ In response to Special Issue 82 the jury found the deceased to be a "principal." The burden of proof on Special Issue 81 was upon appellant. The burden of proof on Special Issue 82 was placed on appellees. The finding of the jury in response to Special Issue 82 that the deceased was a "principal" is a finding which, while consistent with the answer to Special Issue 81, stands as a separate and distinct finding of negligence against the deceased.

In Dixon v. Samartino, 163 S.W.2d 739 (Galveston Civ.App., 1942, ref., w. m.), the court held: "The answers to said special issues (similar to Issues 81 and 82) are in effect findings by the jury that Carl Dixon was guilty of contributory negligence in joining others in the commission of an assault and battery upon appellee which proximately caused the injury which resulted in his death."

■ The evidence heretofore reviewed is likewise sufficient to sustain the jury's answers to Special Issues 73, 74 and 75 that the deceased stood near the driver during the attack, that such act was negligence and a proximate cause of his death.

In response to Special Issue 4 the jury found that appellee Dyson was not acting

in the course and scope of his employment for appellee Fort Worth Transit Company at the time he shot the deceased.

No complaint is made as to the form of the special issue. The contention is that the negative finding was contrary to the great weight and preponderance of the evidence. Appellant had the burden of establishing this fact to the satisfaction of the jury. The jury heard the testimony of the entire transaction from witnesses to the events, including specific testimony offered by the appellant from depositions of company employees who also testified in person.

Lynn Yeatts, Superintendent of Transportation for the Transit Company, testified generally, and specifically, as to the duties and responsibilities of a bus operator such as Mr. Dyson.

Appellant offered in evidence a booklet for the guidance of bus operators. Portions of the booklet were read to the jury. Mr. Yeatts also testified that an operator is not authorized to fire a weapon.

"It is very clear from the cases considered above that to hold the master liable for the tort of the servant, certain things must appear: (a) The tortious act must have arisen in the performance of a duty of the servant under the authority conferred upon him; (b) it must have been in furtherance of the master's business; (c) and negatively, the servant must not have stepped aside from his master's business to engage in a mission of his own." Greathouse v. Texas Public Utilities Corporation, 217 S.W.2d 190, 197 (Eastland Civ.App., 1948, ref., n. r. e.).

It appears obvious from the record in this case that Dyson was not acting for the Company. He "stepped aside from his master's business to engage in a mission of his own." The duration of such a mission of his own, whether for a long time or a short time, is not important in the application of the above rule.

To the same effect see also Dart v. Yellow Cab, Inc., 401 S.W.2d 874 (Amarillo Civ.App., 1966, ref., n. r. e.); Pratley v. Sherwin-Williams Co., 56 S.W.2d 510 (El Paso Civ.App., 1933, no writ hist.); Texas & P. Ry. Co. v. Hagenloh, 151 Tex. 191, 247 S.W.2d 236 (1952).

The appellant cites a number of authorities in each of which the employee embarked on a course of action dictated by his duty and his responsibility as an employee which resulted in an injury. Based upon this reasoning appellant then argues that the mere fact that the Transit Company did not order or authorize Dyson to shoot someone affects the determination very little.

We submit that under the evidence in this case the jury was fully justified in finding that the sole motive prompting the action on the part of Dyson was self-preservation rather than protection of the bus, its passengers, or the maintenance of a schedule. He deviated from the course and scope of his employment and was engaged on a mission personal to himself rather than one in the furtherance of his employer's business. Mitchell v. Ellis, 374 S.W.2d 333 (Fort Worth Civ. App., 1963, writ ref.).

Dyson, under our view of the evidence, did not return to his employment until he reentered the bus, closed its door and drove away.

There is ample evidence to support the submission of and the jury's answer to Special Issue No. 4. The holding is not against the great weight and preponderance of the evidence.

The appellant's fifth point contending that the verdict of the jury was the result of passion and prejudice is based primarily upon the action of the jury in making findings contrary to the contentions of the appellant on several key issues. Appellant contends such findings are contrary to the great weight of the evidence.

The record contains no objection by appellant to the jury or the panel from which it was selected. No objection, motion or requested instruction appears in the record which would have brought to the trial court's attention any contention that passion or prejudice had crept into the trial. Identity of parties was a critical factor for both sides and it was obvious that such identity necessarily included race as well as age, sex, weight, height and attire. It appears to us that the jury fairly considered the testimony. It answered special issues contrary to the position of appellees as well as appellant.

Based upon our examination of the record in this case we are of the opinion that the jury was not motivated by prejudice or passion in arriving at its verdict. To the contrary we are convinced that the jury was motivated solely by the conduct of the parties involved in the incidents which took place on and off the bus and that there is ample evidence to support its verdict.

"Jurors are the exclusive judges of the controverted issues of fact raised by the evidence, of the weight to be given the evidence, and the inferences to be drawn therefrom. They are the exclusive judges of the credibility of the witnesses. 'The law does not attempt to tell jurors what amount or kind of evidence ought to produce a belief in their minds. They may believe a witness although he has been contradicted. They may believe the testimony of one witness and reject the testimony of other witnesses. They may accept part of the testimony of one witness and disregard the remainder.' McCormick & Ray, Texas Law of Evidence, Vol. 1, § 3; Austin Fire Ins. Co. v. Adams-Childers Co., 246 S.W. 365 (Tex.Com.App., 1923)." Beck v. Lawler Properties, 422 S.W.2d 816 (Fort Worth Civ.App., 1967, ref., n. r. e.). See also 4 Tex.Jur.2d, p. 395, § 838 and p. 390, § 837 of same text. See also authorities cited under each.

We have carefully examined the entire record in this case. The evidence points as well as all other points of error are in our opinion without merit and accordingly are overruled. The judgment of the trial court is affirmed.

Affirmed.

BREWSTER, J., not participating.