PD-1672-14

PD-1672-14
COURT OF CRIMINAL APPEALS
AUSTIN, TEXAS
Transmitted 12/29/2014 3:08:55 PM
Accepted 12/30/2014 10:36:50 AM
ABEL ACOSTA
CLERK

NO. _____
IN THE COURT OF CRIMINAL APPEALS OF TEXAS
AUSTIN, TEXAS

---

NO. 01-13-00634-CR
IN THE COURT OF APPEALS FOR THE
FIRST DISTRICT OF TEXAS
AT HOUSTON

---

TRIAL COURT NO. 1268025
IN THE 174TH DISTRICT COURT
OF HARRIS COUNTY, TEXAS

---

DREW RYSER,
*Appellant*

VS.

THE STATE OF TEXAS,
*Appellee*

---

APPELLANT'S PETITION FOR DISCRETIONARY REVIEW

---

FILED IN
COURT OF CRIMINAL APPEALS

December 30, 2014

ABEL ACOSTA, CLERK

Nicole DeBorde
Bires Schaffer and DeBorde
SBOT 00787344
712 Main Street, Suite 2400
Houston, Texas 77002
(713) 228-8500 – telephone
(713) 228-0034 – facsimile
Nicole@BSDLawFirm.com

Attorney for Appellant,
Drew Ryser

## STATEMENT REGARDING ORAL ARGUMENT

Pursuant to TEX. R. APP. PROC. 68.4(c), appellant requests oral argument.

## TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................. ii

INDEX OF AUTHORITIES ..........................................................................iv

STATEMENT REGARDING ORAL ARGUMENT ...............................................vi

STATEMENT OF THE CASE..........................................................................vi

STATEMENT OF PROCEDURAL HISTORY....................................................... vii

GROUND FOR REVIEW NUMBER ONE............................................................6

>    **Did the Court of Appeals err in finding that Appellant did not suffer harm when the jury was aided by the definition of the word "mistreatment", an undefined element of the State's case?**

ARGUMENT .............................................................................................6

GROUND FOR REVIEW NUMBER TWO............................................................9

>    **Did the Court of Appeals decide an important question of state law that has not been settled by the Court of Criminal Appeals when it created a distinction between the jury's use of a standard dictionary and specialized references such as legal dictionaries or law books when determining whether the outside reference material consulted by the jury prejudiced Appellant?**

ARGUMENT .............................................................................................9

GROUND FOR REVIEW NUMBER THREE .....................................................13

>    **Did the Court of Appeals err by in finding that the trial court did not apply an erroneous legal standard when it stated on the record that**

1

**denial of Appellant's change of venue motion was predicated on the lack of statements from potential veniremen?**

ARGUMENT ........................................................................................13

GROUND FOR REVIEW NUMBER FOUR ........................................17

**Did *Bradford* establish an absolute rule that self-defense is only relevant from a defendant's perspective?**

ARGUMENT ........................................................................................17

GROUND FOR REVIEW NUMBER FIVE ..........................................18

**Did the Court of Appeals err in finding that a self-defense justification instruction was necessary to properly instruct the jury on the law of the case?**

ARGUMENT ........................................................................................19

PRAYER FOR RELIEF ......................................................................21

CERTIFICATE OF COMPLIANCE....................................................22

CERTIFICATE OF SERVICE ............................................................23

APPENDIX ....................................................................................... A-1

# INDEX OF AUTHORITIES

**CASES**                                                                                                          **PAGE**

*Bradford v. Fort Worth Transit Company*, 450 S.W.2d 919, 922 (Tex. App.—Fort Worth 1970, writ ref'd n.r.e.) ....................................................................................17, 18

*DuBose v. State*, 915 S.W.2d 493, 497–98 (Tex. Crim. App. 1996).......................16

*Graham v. Connor*, 490 U.S. 386, 397, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989) ...............................................................................................................19

*Guzman v. State*, 955 S.W.2d 85, 90 (Tex. Crim. App. 1997) ...............................16

*In re American Homestar of Lancaster, Inc.*, 50 S.W.3d 480, 483 (Tex. 2001) .....16

*Kniatt v. State*, 239 S.W.3d 910, 912–13 (Tex. App.—Waco 2007, no pet.) .........16

*Lintz v. Am. Gen. Fin., Inc.*, 76 F. Supp. 2d 1200, 1204 (D. Kan. 1999) ..........10, 11

*Lopez v. Allee*, 493 S.W.2d 330, 334 (Tex. Civ. App. 1973) .................................17

*Mayhue v. St. Francis Hosp. of Wichita, Inc.*, 969 F.2d 919, 922 (10th Cir. 1992)...............................................................................................11

*McQuarrie v. State*, 380 S.W.3d 145 (Tex. Crim. App. 2012) ................................9

*Phillips v. State*, 701 S.W.2d 875, 879 (Tex. Crim. App. 1985) .............................14

*Renteria v. State*, 206 S.W.3d 689, 709 (Tex. Crim. App. 2006)............................15

*Ryser v. State*, No. 01-13-00634-CR, 2014 WL 6678923, at *20 (Tex. App.—Houston [1st Dist.] Nov. 25, 2014, no pet h.) (emphasis added)......................................................................... 6, 7, 10, 13, 17, 18

*Sheppard v. Maxwell*, 384 U.S. 333 (1966)............................................................14

*State v. Melton*, 692 P.2d 45, 49 (N.M. Ct. App. 1984) .........................................10

*State v. Tinius*, 527 N.W.2d 414, 417 (Iowa Ct. App. 1994)....................................10

*Tennessee v. Garner*, 471 U.S. 1, 11, 105 S. Ct. 1694, 1701, 85 L. Ed. 2d 1
writ refused n.r.e.) (1985) ...............................................................................19

## <u>STATUTES AND RULES</u>

TEX. CONST. art. I, § 19.....................................................................................20

TEX. JUR.2d § 26 at 669–72 (1961).........................................................................19

TEX. PENAL CODE ANN. § 39.03(a) ..........................................................................8

U.S. CONST. amend. V ......................................................................................21

U.S. CONST. amend. XIV ...................................................................................21

TO THE COURT OF CRIMINAL APPEALS:

## STATEMENT OF THE CASE

This incident is alleged to have taken place on March 23, 2010. (C.R. 11). Appellant was employed by the Houston Police and was assigned to the Gang Unit, which was assisting another unit, the TACT Unit, with its investigation of an influx of burglaries in the Wellington Park area of Houston. (9 R.R. 83). The TACT Unit radioed the Gang Unit that a group of burglary suspects was driving toward its location. (9 R.R. 85-86). Two of the suspects, including the complainant, jumped from their vehicle and began to run. (9 R.R. 99). All four of the suspects were caught and arrested. (9 R.R. 128). The arrest was captured on video by surveillance cameras mounted on a nearby business and sparked controversy throughout the City of Houston. (6 R.R. 10). The video showed the complainant lying face down while the officers used force to effectuate the arrest. (6 R.R. 10).

## STATEMENT OF PROCEDURAL HISTORY

On June 23, 2010, Officer D. Ryser (Appellant) was indicted for the offense of Official Oppression alleged to have occurred on or about March 23, 2010. (C.R. 11). The case was assigned to the 180th District Court. (C.R. 11). This case was later transferred to the 174th. On July 18, 2011, Appellant filed a Motion for Change of Venue, based on pretrial publicity and a dangerous combination of

media coverage and commentary by influential persons, which was denied on August 23, 2011, after hearing. (C.R. 41).

Appellant timely filed a motion for new trial on July 11, 2013, based on jury misconduct, which was denied after arguments by counsel for the State and Defense. (C.R. 301; 15 R.R. 15). Appellant gave timely notice of appeal.

On November 25, 2014, the First Court of Appeals affirmed the verdict from the trial court. *Ryser v. State*, 01-13-00634-CR, op. issued November 25, 2014 (Tex. App.—Houston [1st Dist.] 2014, no pet h.). No motion for rehearing was filed. Appellant now timely petitions this Honorable Court for discretionary review. Appellant presents five (5) grounds for review before this Honorable Court.

## APPELLANT'S FIRST GROUND FOR REVIEW

**Did the Court of Appeals err by in finding that Appellant did not suffer harm when the jury was aided by the definition of the word "mistreatment", an undefined element of the State's case?**

## ARGUMENT

Appellant was charged with official oppression, which was defined for the jury as follows:

> Our law provides that a public servant acting under color of his office or employment commits the offense of official oppression if he intentionally subjects another to *mistreatment* that he knows is unlawful.

That language is consistent with the language in the statute criminalizing official oppression. TEX. PENAL CODE ANN. § 39.03(a). *Ryser v. State*, No. 01-13-00634-CR, 2014 WL 6678923, at \*20 (Tex. App.—Houston [1st Dist.] Nov. 25, 2014, no pet h.) (emphasis added). The Court of Appeals went on to excuse the jury's use of the definition during its deliberation and explained the term "mistreatment" defined as acting "roughly" or "wrongly" was compatible with the commonly understood meaning of the word and did not conflict with the trial court's instructions. *Id*. at 21.

On the second day of deliberations the jury foreman shared a definition of the term "mistreatment" with the rest of the jury after the trial court declined to provide it with a definition. (Supp. C.R. 13; 33). The jury returned a guilty verdict approximately 54 minutes after discussing the definition provided by the foreman. (Supp. C.R. 33; C.R. 288). The foreman referenced a general-use dictionary and found the term "mistreatment" defined as acting "roughly" or "wrongly." The Court of Appeals held that Appellant "failed to show how reference to the dictionary prejudiced him." *Id*. at 21.

"The [official oppression] statute does not define the term 'mistreatment,' and neither did the jury charge." *Id*. at 20. This court and lower courts have been presented with numerous opportunities to define "mistreatment" but have declined to do so. However, the First Court of Appeals has, in a published opinion, now

7

created a definition for the term "mistreatment" as "roughly" or "wrongly". *See id.* at 21.

The words "roughly" or "wrongly" as used to define "mistreatment" is unworkable because an arrest is often naturally rough. Arrests are often necessarily rough because every police encounter is an armed encounter because police officers are armed with weapons. If a suspect attempted to overpower an officer is successful, the suspect then naturally has control over that officer's weapon. Police officers have a right and duty to protect themselves and their weapons. The use of force is allowed under the law when a police officer effectuates an arrest. It is even possible that an officer could be so rough as to cause a suspect's death, legally, under certain circumstances. What a police officer is not allowed to do is use excessive force and the term "roughly" does not adequately or accurately describe the phrase "excessive force". Thus, if "roughly" is allowed to stand as the definition of "mistreatment" then Appellant was convicted of potentially legal conduct and any police officer charged with official oppression in the future also faces the possibility of being convicted of a crime for legal conduct.

In addition, in this case, the juror looked up an actual element of the State's case and used it to obtain a conviction against Appellant. The jury specifically asked the trial court for the definition and was correctly told to confine itself to the

court's charge. (Supp. C.R. 33). The jury did the exact opposite of what was instructed and turned to a legally inadequate and inaccurate outside source for guidance. The jury foreman essentially turned advocate against Appellant after the trial court declined to provide him with a definition. The record reflects the jury deliberated for a full day without success. (12 R.R. index-1; Supp. C.R. 13). The next day, the foreman brought in the definition and the jury reached a verdict a short time later. (C.R. 288; Supp. C.R. 33).

The Court of Appeals erred in holding Appellant did not suffer prejudice as a result of the significantly harmful definition of "mistreatment". Accordingly, review is warranted pursuant to Tex. R. App. P. 66.3(c) and this case should be remanded to the Court of Appeals or reversed and rendered.

APPELLANT'S SECOND GROUND FOR REVIEW

**Did the Court of Appeals decide an important question of state law that has not been settled by the Court of Criminal Appeals when it created a distinction between the jury's use of a standard dictionary and specialized references such as legal dictionaries or law books when determining whether the outside reference material consulted by the jury prejudiced Appellant?**

ARGUMENT

While the Court of Appeals correctly concluded the definition that the jury foreman obtained from Webster's Dictionary of the term "mistreatment" constituted an "outside influence" under *McQuarrie v. State*, 380 S.W.3d 145

9

(Tex. Crim. App. 2012), the conclusion that the error did not require reversal of Appellant's conviction compels the granting of this petition. *Ryser v. State*, No. 01-13-00634-CR, 2014 WL 6678923, at \*19 (Tex. App.—Houston [1st Dist.] Nov. 25, 2014, no pet h.).

The Court of Appeals looked outside this jurisdiction for guidance on determining the proper manner in which to conduct the harm analysis. Relying on *Tinius* and *Melton*, the Court of Appeals made a distinction between "a jury's use of standard dictionaries and more specialized references such as legal dictionaries or law books in determining whether a defendant is prejudiced by the use of outside reference materials." *Id*. The distinction turns on whether, in the Court's view, the definition encountered by the jury was "fairly innocuous" in that it "neither conflicts with the legal concepts included in the jury instructions nor contradicts any other aspect of the jury charge." *Id*. (citing *State v. Tinius*, 527 N.W.2d 414, 417 (Iowa Ct. App. 1994) (stating that dictionary definition "was fairly innocuous"); *State v. Melton*, 692 P.2d 45, 49 (N.M. Ct. App. 1984) (noting that definitions of words "control," "keep," and "possess" that juror found in dictionary "did not vary from the usual ordinary meaning of those words, or from the meaning contained in the trial court's instructions.").

In *Lintz v. Am. Gen. Fin., Inc.*, the Court explained:

10

It is well settled that a jury's exposure to extrinsic information gives rise to a rebuttable presumption of prejudice. See Mayhue v. St. Francis Hosp. of Wichita, Inc., 969 F.2d 919, 922 (10th Cir. 1992). As the Tenth Circuit has recognized, however, a trial court "will rarely be able to ascertain the actual prejudicial impact of a jury's exposure to external influences because a jury cannot testify regarding the subjective effect of such influences during a Rule 606(b) hearing." *See id*. at 923. Therefore, the court must confirm or rebut the presumption of prejudice by objectively weighing all of the facts and circumstances of the case. *Id*. at 923–24. In that regard, the Circuit has cited a number of factors relevant to determining whether the presumption of prejudice has been rebutted when a jury consults a dictionary without authorization. They are as follows:

(1) The importance of the word or phrase being defined to the resolution of the case.
(2) The extent to which the dictionary definition differs from the jury instructions or from the proper legal definition.
(3) The extent to which the jury discussed and emphasized the definition.
(4) The strength of the evidence and whether the jury had difficulty reaching a verdict prior to introduction of the dictionary definition.
(5) Any other factors that relate to a determination of prejudice.

*Lintz v. Am. Gen. Fin., Inc.*, 76 F. Supp. 2d 1200, 1204 (D. Kan. 1999) (citing *Mayhue v. St. Francis Hosp. of Wichita, Inc.*, 969 F.2d 919, 922 (10th Cir. 1992)).

The Court of Appeals opted to place a higher burden on Appellant by creating a distinction between the type of extrinsic material improperly consulted by the jury, subjecting Appellant to an unfair and unworkable standard. Instead the Court of Appeals should have opted to utilize the approach taken in *Lintz*. In *Lintz*,

11

the Court explained that the inquiry should start with a presumption of prejudice. 76 F. Supp. 2d 1204. The court's analysis should then be focused on either confirming or rebutting the presumption of prejudice by objectively weighing all of the facts and circumstances of the case and applying the factors set forth. *Id.*

In addition, Appellant asserts in this court, as he did in the Court of Appeals, that his Sixth Amendment right to a trial by jury and due process rights were violated because the harmful outside influence did not come from the witness stand, Appellant did not have the full protection of the right to confrontation, and the right to cross-examination by counsel. The delivery of the definition of "mistreatment" by the jury foreman to the rest of the jury denied Appellant the right to a fair trial by an impartial jury. The harmful outside influence was deliberately and improperly brought to bear on the rest of jury with the specific intention of using it to attempt to convince an undecided juror to change her vote to guilty and succeeded in doing so.

In opting to utilize the "fairly innocuous" standard, the Court of Appeals has, in a published opinion, decided an important question of law that has not yet been, but should be decided by this Court such that discretionary review in this matter is warranted pursuant to Tex. R. App. P. 66.3(b). Accordingly, review is warranted pursuant to Tex. R. App. P. 66.3(b) and this case should be remanded to the Court of Appeals in order for a proper harm analysis to be conducted.

## APPELLANT'S THIRD GROUND FOR REVIEW

**Did the Court of Appeals err by finding that the trial court did not apply an erroneous legal standard when it stated on the record that denial of Appellant's change of venue motion was predicated on the lack of statements from potential veniremen?**

## ARGUMENT

The Court of Appeals erred by finding that Appellant "has not established that the trial court employed an erroneous legal standard in analyzing his change of venue motion. *Ryser v. State*, No. 01-13-00634-CR, 2014 WL 6678923, at *16 (Tex. App.—Houston [1st Dist.] Nov. 25, 2014, no pet h.). In *Henley v. State*, 576 S.W.2d 66, 70 (Tex. Crim. App. 1978), the Court of Criminal Appeals reversed the judgment of the trial court when it "predicated its denial of appellant's motion solely upon the successful qualification of a jury panel" resulting in the court "*confus[ing] the grounds for change of venue* with the grounds for juror challenge for cause." (emphasis added). In this case, the trial court confused the grounds for change of venue by predicating denial of Appellant's motion to change venue on the lack of any statements from potential veniremen. (3 Supp. C.R. 65). The trial court should have instead used the test established by the U.S. Supreme Court and adopted by the this Court to determine whether outside influences affecting the community's climate of opinion as to Appellant were inherently suspect. *Sheppard*

13

*v. Maxwell*, 384 U.S. 333 (1966); *Phillips v. State*, 701 S.W.2d 875, 879 (Tex. Crim. App. 1985).

At the conclusion of the change of venue hearing, the trial court summed up its decision to deny the motion as follows:

COURT'S RULING

> THE COURT: All right. Having heard yesterday and today motion of the defense for a change of venue in this case and having heard the numerous witnesses including the mayor, the chief of police, and the other people who are involved in this case thus far including Mr. X, I at this time have heard everything from the defense and from the people, but I have not heard -- I'm looking for it right now -- any statements from potential veniremen who would be seated in this particular case except for the evidence which has come out of some of those witnesses. At this time, having not heard or examined any of such public knowing -- noting that in this county there are 30 states who have more population than this county, so, at this time, I deny the motion for change of venue.

(3 Supp. R.R. 65).

The Court of Appeals explained in reaching its decision that Appellant "overstates the significance of that statement" and that "[i]n context, the trial court explained that its conclusion to deny the venue motion was reached in light of all of the evidence presented at the two-day venue hearing . . . ." *Id.*

The trial court did in fact state that it heard from numerous witnesses and also explained that Harris County is diverse. However, the trial court specifically stated that it had "not heard -- I'm looking for it right now -- any statements from

14

potential veniremen who would be seated in this particular case except for the evidence which has come out of some of those witnesses. At this time, having not heard or examined any of such public knowing . . . I deny the motion for change of venue." (3 Supp. R.R. 65). The trial court did not state on the record that it has analyzed whether outside influences affecting the community's climate of opinion as to a defendant are inherently suspect, which is the proper legal standard. Consequently, that statement is indisputable evidence that the trial court applied an erroneous legal standard.

The Court of Appeals' reliance on *Renteria v. State*, 206 S.W.3d 689, 709 (Tex. Crim. App. 2006) is misplaced and entirely distinguishable. In *Renteria*, this Court explained that the trial court did not abuse its discretion when "[t]he introduction of the various witnesses' testimony at the hearing on the motion to change venue presented a factual dispute for the trial court to resolve-whether appellant could receive a fair trial in El Paso County." *Id*. In that case, the trial court denied the change of venue motion and the record supported the finding. *Id*. However, that case does not address what legal standard the trial court applied. In this case, the trial court explicitly stated on the record what its analysis was and how it came to its decision.

Finally, the fact that individual voir dire was granted by the trial court has no bearing on this issue. The Court of Appeals explained Appellant had the

15

"opportunity to question any venire members who might state that they were aware of the pre-trial publicity, to inquire about the publicity's effect on their suitability to serve as jurors, and, if necessary, to raise the issue again if the venire members' answers indicate that publicity tainted the jury pool." Appellant filed the change of venue motion, conducted a hearing, and obtained a ruling. Therefore, the error was preserved and Appellant was not required to "re-preserve" this issue.

Although trial courts have a wide range of discretion failure to apply the correct legal standard is an abuse of discretion and warrants granting review. *Kniatt v. State*, 239 S.W.3d 910, 912–13 (Tex. App.—Waco 2007, no pet.) (citing *DuBose v. State*, 915 S.W.2d 493, 497–98 (Tex. Crim. App. 1996), *overruled on other grounds by Guzman v. State*, 955 S.W.2d 85, 90 (Tex. Crim. App. 1997); *see also In re American Homestar of Lancaster, Inc.*, 50 S.W.3d 480, 483 (Tex. 2001) (holding that the trial court's failure to analyze or apply the law correctly is an abuse of discretion.). In finding the trial court did not apply an erroneous legal standard, the Court of Appeals has, in a published opinion, decided an important question of state or federal law in a way that conflicts with the applicable decisions of the Court of Criminal Appeals or the Supreme Court of the United States such that discretionary review in this matter is warranted pursuant to Tex. R. App. P. 66.3(c). Accordingly, review is warranted pursuant to Tex. R. App. P. 66.3(c), and this court should reverse the decision of the Court of Appeals.

16

APPELLANT'S FOURTH GROUND FOR REVIEW

**Did *Bradford* establish an absolute rule that self-defense is only relevant from a defendant's perspective?**

ARGUMENT

The Court of Appeals erred by holding that *Bradford v. Fort Worth Transit Company*, 450 S.W.2d 919, 922 (Tex. App.—Fort Worth 1970, writ ref'd n.r.e.), does not establish an absolute rule that self-defense is relevant only from a defendant's perspective. *Ryser v. State*, No. 01-13-00634-CR, 2014 WL 6678923, at *9 (Tex. App.—Houston [1st Dist.] Nov. 25, 2014, no pet h.).

Since 1970, the case law concerning self-defense has stated that self-defense must always be viewed form the standpoint of the defendant. *Bradford*, 450 S.W.2d 922; *accord Lopez v. Allee*, 493 S.W.2d 330, 334 (Tex. Civ. App. 1973 writ refused n.r.e.). However, with little to no analysis the court has overruled this longstanding principle.

The court conducted no specific analysis other than to cite *Bradford* itself and a secondary source, which suggests the exact opposite of the court's conclusion. The court rationalized its decision by stating "the rule is that self-defense must be viewed from the relevant actor's perspective, taking into account his knowledge at the time he acted, and not the viewpoint of the jury that has the benefit of hindsight in evaluating whether the actor actually was in danger." *Id.*

17

(citing *Bradford*, 450 S.W.2d 922). The court went on to cite Texas Jurisprudence as added support and stated that in *Bradford*, "the question whether the killing was justifiable is not to be viewed in the light of later events, but by what the *defendant* reasonably believed at the time." *Ryser*, 2014 WL 6678923, at *9 (quoting 28 Tex. Jur.2d § 26 at 669–72 (1961)) (emphasis added). The secondary source cited by the court suggests exactly what *Bradford* stands for: the perspective is what the defendant reasonably believed at the time.

The Court of Appeals erred in finding that *Bradford* does not establish an absolute rule that self-defense is relevant only from a defendant's perspective decided an important question of state or federal law in a way that conflicts with the applicable decisions of the Court of Criminal Appeals or the Supreme Court of the United States such that discretionary review in this matter is warranted pursuant to Tex. R. App. P. 66.3(c). Accordingly, review is warranted pursuant to Tex. R. App. P. 66.3(c) and the decision of the Court of Appeals should be reversed.

<u>APPELLANT'S FIFTH GROUND FOR REVIEW</u>

**Did the Court of Appeals err in finding that a self-defense justification instruction was necessary to properly instruct the jury on the law of the case?**

18

ARGUMENT

The Court of Appeals incorrectly concluded that a self-defense instruction was necessary to present fully the law on law-enforcement justification. *Ryser v. State*, No. 01-13-00634-CR, 2014 WL 6678923, at \*7 (Tex. App.—Houston [1st Dist.] Nov. 25, 2014, no pet h.). The State asked for the instruction in response to Appellant's request for an instruction to the jury explaining the "law enforcement" justification. *Id.*

A self-defense instruction is a justification instruction *limiting criminal responsibility*. In this case, there was no criminal responsibility to limit because the instruction was provided from the perspective of the complainant. To include such an instruction constitutes an impermissible comment on the weight of the evidence. Further, whether the complainant was defending himself made no difference to the juror's evaluation of an objective officer in Appellant's shoes, the only appropriate evaluation. *Tennessee v. Garner*, 471 U.S. 1, 11, 105 S. Ct. 1694, 1701, 85 L. Ed. 2d 1 (1985); *Graham v. Connor*, 490 U.S. 386, 397, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). Inclusion of the instruction essentially shifted the burden to Appellant to disprove self-defense. Moreover, including the self-defense instruction functioned as a limit on Appellant's "law enforcement" justification defense. Finally, not including an application paragraph caused harmful confusion

19

to the jury. The jury could not get away from what was wrong with the charge once they read it because once they believed the complainant was acting in self-defense the assumption is that Appellant must be guilty, or at a minimum, that such a conclusion must be relevant to Appellant's guilt. If the instruction was correctly included, the jury should have been told what to do, to do nothing and disregard its conclusion on this issue, if it believed the complainant's self-defense theory. By not including an application paragraph the trial court shifted due process entitlements over to the complainant, in violation of the constitutions of the State of Texas and of the United States when the only person entitled to due process in the courtroom was Appellant. U.S. CONST. amend. V; U.S. CONST. amend. XIV; TEX. CONST. art. I, § 19.

The Court of Appeals erred in finding that a self-defense instruction was necessary to properly instruct the jury on the law of the case and has, in a published opinion, decided an important question of state or federal law in a way that conflicts with the applicable decisions of the Court of Criminal Appeals or the Supreme Court of the United States such that discretionary review in this matter is warranted pursuant to Tex. R. App. P. 66.3(c). Accordingly, review is warranted pursuant to Tex. R. App. P. 66.3(c).

## PRAYER FOR RELIEF

WHEREFORE, PREMISES CONSIDERED, Appellant prays that this Honorable Court grant this Petition for Discretionary Review. Following the grant of review, Appellant prays that the judgment of the Court of Appeals be reversed and rendered, or reversed and a new trial ordered, or the case remanded for further review.

Respectfully submitted,

/s/ Nicole DeBorde
Nicole DeBorde
BIRES SCHAFFER AND DEBORDE
Texar Bar No. 00787344
712 Main Street, Suite 2400
Houston, Texas 77002
(713) 228-8500 – Telephone
(713) 228-0034 – Facsimile
Email: Nicole@BSDLawFirm.com

Attorney for Appellant,
Drew Ryser

21

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 9 of the Texas Rules Appellate Procedure, the undersigned counsel of record certifies that the Petition for Discretionary Review contains 4,353 words.

*/s/ Nicole DeBorde*
Nicole DeBorde

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of Appellant's petition for discretionary review has been either personally served upon or mailed by U.S. Postal Service certified mail, return receipt requested, on December 29, 2014, to the following persons:

Devon Anderson
District Attorney
1201 Franklin, Suite 600
Houston, Texas 77002

State Prosecuting Attorney
P.O. Box 12405
Austin, Texas 78711

Respectfully submitted,


*/s/ Nicole DeBorde*
Nicole DeBorde

**A P P E N D I X**



In The

# Court of Appeals

For The

## First District of Texas

———————————

### NO. 01-13-00634-CR

———————————

**DREW RYSER, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

On Appeal from the 174th District Court
Harris County, Texas
Trial Court Case No. 1268025

---

## O P I N I O N

Houston Police Department Officer Drew Ryser's use of force while arresting a burglary suspect, C. Holley, led to a police department internal investigation, termination of Ryser's employment, and criminal charges against him. A jury convicted Ryser of the Class A misdemeanor offense of official

oppression.[1] The trial court assessed punishment at six months' confinement but suspended the sentence and placed Ryser on community supervision for two years.

Ryser contends that there was insufficient evidence to support his conviction. In four other issues, he also contends that the trial court erred by (1) charging the jury on the law of parties and self-defense, (2) denying his venue motion, (3) refusing to dismiss a juror he describes as sleeping during trial, and (4) denying his motion for new trial based on jury misconduct during deliberations. Finally, in his sixth issue, Ryser argues that the cumulative effect of multiple errors requires reversal.

We affirm.

## Background

Ryser was employed by the HPD and assigned to its divisional gang unit, which was assisting another unit, the tactical unit, with its investigation of some burglaries in the Wellington Park area of Houston. The tactical unit radioed the gang unit that a group of burglary suspects was driving toward its location. Ryser's team encountered the burglary suspects on a nearby street. Two of the suspects,

---

[1] *See* TEX. PENAL CODE ANN. § 39.03(a)(1) (West Supp. 2014) (providing that a public servant acting under color of his office or employment commits an offense if he "intentionally subject another to mistreatment . . . that he knows is unlawful"); *Id.* § 39.03(d) (West Supp. 2014) (stating that offense of official oppression is a Class A misdemeanor, with one inapplicable exception); *Id.* § 12.21 (West 2011) (specifying punishment for Class A misdemeanor to be fine not to exceed $4,000, confinement in jail for term not to exceed one year, or both).

including 15-year-old Holley, jumped from their vehicle and began to run. All four of the suspects were caught and arrested.

The arrest report prepared by Sergeant H. Sanchez states that the burglary suspects resisted arrest by kicking and using closed fists. The report does not state that the police officers used force during the arrest or that they damaged any property during the encounter. No supplemental report was filed by any of the other officers involved in the arrest, including Ryser.

Sometime later, an employee at a local business noticed damage to a fence along the edge of the property. She reviewed surveillance video to determine the cause of the damage and saw that a police vehicle had struck the fence. The video further showed that, just before the vehicle struck the fence, it collided with a person running along the fence line and knocked him to the ground. On the videotape, which was admitted into evidence and played at Ryser's trial, the suspect, Holley, is seen lying on the ground, not moving, with his hands near his head. A group of officers then surround him and begin kicking and striking him. Within minutes, the suspect is handcuffed and the officers disperse.

The business owner gave the videotape to the police department, and an internal investigation was begun. A local community activist, Quanell X, obtained a copy of the videotape and released it to a local television station. It aired multiple times, which led to news articles, town meetings, and a news conference by then

3

District Attorney Pat Lykos, Houston Mayor Anise Parker, and Houston Chief of Police C. McClelland. At the news conference, the city officials announced that Ryser and several other officers who participated in Holley's arrest were being terminated from employment with HPD and charged with a crime due to their use of force against Holley. A number of other persons in Harris County also made public remarks regarding the incident depicted in the videotape.

The officers jointly moved for a change of venue based on the negative publicity from the airing of the videotape, the statements made at the news conference, and other media coverage related to the arrest. The trial court heard from 13 witnesses, including Quanell X, the mayor, and the police chief. While Quanell X, the mayor, and the police chief all testified that the officers could receive a fair trial in Houston, defense attorneys called as witnesses by the defendant-officers testified that they could not. The trial court denied the motion, and the officers were tried separately in Houston.

At trial, Ryser admitted that he struck Holley in the head and performed four "knee strikes" on Holley's shoulder. He gave two justifications for his use of force: (1) to obtain Holley's compliance with another officer's verbal commands and (2) to gain control over Holley's hands because Ryser believed that Holley had a gun in his waistband and might try to access it during the struggle.

A senior police officer, T. Jefferson, testified that the use of force displayed on the video is not consistent with the methods taught by HPD. Police Chief McClelland agreed that the officers violated department procedures. He described the officers' actions as "an egregious use of force" that "made me sick to my stomach."

The jury found Ryser guilty of the offense of official oppression. The trial court assessed punishment at six months' confinement but suspended the sentence and placed Ryser on two years' community supervision. Ryser timely appealed.

## Insufficient Evidence

In his fifth issue, Ryser asserts that there was insufficient evidence to support his conviction for official oppression.

### A. Standard of review

We review Ryser's challenge to the sufficiency of the evidence under the standard enunciated in *Jackson v. Virginia*, 443 U.S. 307, 318–20, 99 S. Ct. 2781, 2788–89 (1979). *Brooks v. State*, 323 S.W.3d 893, 894–913 (Tex. Crim. App. 2010). Under the *Jackson* standard, evidence is insufficient to support a conviction if, considering all the record evidence in the light most favorable to the verdict, no rational factfinder could have found that each essential element of the charged offense was proven beyond a reasonable doubt. *See Jackson*, 443 U.S. at 317–19, 99 S. Ct. at 2788–89; *Laster v. State*, 275 S.W.3d 512, 517 (Tex. Crim. App.

5

2009). Evidence is insufficient under four circumstances: (1) the record contains no evidence probative of an element of the offense; (2) the record contains a mere "modicum" of evidence probative of an element of the offense; (3) the evidence conclusively establishes a reasonable doubt; or (4) the acts alleged do not constitute the criminal offense charged. *See Jackson*, 443 U.S. at 314, 318 & n.11, 320, 99 S. Ct. at 2786, 2788–89 & n.11; *Laster*, 275 S.W.3d at 518; *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007). We consider both direct and circumstantial evidence and all reasonable inferences that may be drawn from that evidence in making our determination. *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007).

Jurors are the exclusive judges of the facts, the credibility of the witnesses, and the weight to be given the witnesses' testimony. *Penagraph v. State*, 623 S.W.2d 341, 343 (Tex. Crim. App. 1981); *Jaggers v. State*, 125 S.W.3d 661, 672 (Tex. App.—Houston [1st Dist.] 2003, pet. ref'd). "[R]econciliation of conflicts in the evidence is within the exclusive province of the jury." *Wyatt v. State*, 23 S.W.3d 18, 30 (Tex. Crim. App. 2000) (quoting *Losada v. State*, 721 S.W.2d 305, 309 (Tex. Crim. App. 1986)). It may choose to believe or disbelieve any part of any witness's testimony. *See Davis v. State*, 177 S.W.3d 355, 358 (Tex. App.—Houston [1st Dist.] 2005, no pet.).

Thus, the *Jackson* standard defers to the factfinder to resolve any conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from "basic facts to ultimate facts." *Jackson*, 443 U.S. at 318–19, 99 S. Ct. at 2788–89; *Clayton*, 235 S.W.3d at 778. An appellate court presumes the factfinder resolved any conflicts in the evidence in favor of the verdict and defers to that resolution, provided that the resolution is rational. *See Jackson*, 443 U.S. at 326, 99 S. Ct. at 2793. If an appellate court finds the evidence insufficient under this standard—meaning that no rational factfinder could have found that each essential element of the charged offense was proven beyond a reasonable doubt—it must reverse the judgment and enter an order of acquittal. *See Tibbs v. Florida*, 457 U.S. 31, 41, 102 S. Ct. 2211, 2218 (1982); *Jackson*, 443 U.S. at 317–19, 99 S. Ct. at 2788–89.

## B.    There is legally sufficient evidence of all elements of offense

Ryser contends that his conviction must be reversed because there was legally insufficient evidence that he intended to assault Holley when he used force against him.

A person commits the offense of official oppression if he is a "public servant acting under the color of his office or employment" and "intentionally subjects another to mistreatment . . . that he knows is unlawful." TEX. PENAL CODE ANN. § 39.03(a)(1) (West Supp. 2014).

Mistreatment is not defined by statute. However, the indictment and jury charge listed specific acts that the State asserted were acts of mistreatment by Ryser against Holley, including that Ryser kneed him, kicked him, struck him with his hand, or pushed his head with his hand. Based on those descriptions, for this Court to affirm the judgment, there must be legally sufficient evidence that Ryser intentionally mistreated Holley—by kneeing him, kicking him, striking him with his hand, or pushing his head with his hand—with knowledge that doing so was unlawful. *See id.* § 39.03(a)(1); *State v. Edmond*, 933 S.W.2d 120, 127 (Tex. Crim. App. 1996) (requiring that defendant know that his conduct is unlawful).

"Unlawful" means "criminal or tortious or both and includes what would be criminal or tortious but for a defense not amounting to justification or privilege." TEX. PENAL CODE ANN. § 1.07(a)(48) (West 2011). Therefore, there must be legally sufficient evidence that Ryser knew his mistreatment was criminal or tortious or that it would be criminal or tortious because his defense was inadequate to establish a justification. *See Norris v. Branham*, 557 S.W.2d 816, 818 (Tex. App.—El Paso 1977, writ ref'd n.r.e.) (noting that definition of unlawful recognizes defense of justification).

It is undisputed that Ryser intended to knee and strike Holley during the arrest:

> Ryser: I—the first thing I did was I reacted and I popped him in the nose. . . .
>
> Attorney: Why did you try that? I mean . . . .
>
> Ryser: It work[ed] when my brother popped me on the nose as a kid and it's worked on suspects before.
>
> .   .   .   .
>
> Attorney: When that wasn't effective, what did you do?
>
> Ryser: I attempted to perform knee strikes on his shoulder.
>
> Attorney: What are knee strikes?
>
> Ryser: Striking with my knee in the shoulder intending to cause pain.

Ryser conceded that this method of force was not something that he was taught to do at the police academy. When asked whether he made contact with Holley during the "knee strikes," he responded:

> Not like I hoped . . . I was slipping in the grass. I couldn't keep my balance. And I ended up just kind of landing on his shoulder as opposed to actually striking his shoulder. So I reached over to grab the fence to try to get my balance, too, so I could deliver a good one. And I wasn't able to do so.

While Ryser readily admits he intended to strike and knee Holley, he denies that he intended to mistreat him in doing so. According to Ryser, his use of force was necessary to complete the arrest and was justified.

9

The law provides a justification defense to police officers, permitting the use of force to complete an arrest, but there are limits. *Cf. Daugherty v. State*, 176 S.W.2d 571, 575 (Tex. Crim. App. 1943) ("We disclaim any intention to say . . . that an officer has a right to approach a party whom he wishes to arrest and beat him into submission . . . ."). Section 9.51(a) of the Penal Code provides that a peace officer "is justified in using force against another when and to the degree the actor reasonably believes the force is immediately necessary to make or assist in making an arrest . . . ." TEX. PENAL CODE ANN. § 9.51(a) (West 2011). If an officer uses more force than is reasonably necessary, he exceeds his statutory authority and may be subject to criminal liability.

For a conviction on the charge of official oppression, the Penal Code requires that Ryser knew his mistreatment was unlawful. *Id.* §§ 1.07(a)(48), 39.03(a)(1). Thus, the jury must find that Ryser knew that he was kneeing or striking Holley with more force than was immediately necessary to make or assist in making the arrest. *See Edmond*, 933 S.W.2d at 127. Direct evidence of Ryser's mental state was not required. *Hooper v. State*, 214 S.W.3d 9, 14–15 (Tex. Crim. App. 2007). The jury could draw reasonable inferences from the evidence to find the requisite knowledge. *Id.*; *Rabb v. State*, 434 S.W.3d 613, 617 (Tex. Crim. App. 2014).

The videotape of the arrest showed Holley being struck by a police car, falling immediately to the ground, then lying there with his hands motionless next to his head. Ryser and several other officers are then seen encircling Holley. Ryser kneed him four times as at least five other officers held, kicked, and stomped on him. At trial, Ryser provided an explanation for the amount of force observed on the video, but other witnesses, including the chief of police, testified that his use of force violated department procedures and was "egregious." The jury, as the factfinder, was charged with evaluating the credibility of the witnesses and weighing the evidence. *Jaggers*, 125 S.W.3d at 672. When viewing the evidence in the light most favorable to the verdict—including the arrest videotape—we conclude that there was legally sufficient evidence from which the jury could have concluded that Ryser intended to knee and strike Holley and that he knew he was using more force than was immediately necessary to effectuate the arrest, i.e., that he knew his mistreatment of Holley was unlawful.

Ryser's fifth issue is overruled.

## Jury Charge

In his first issue, Ryser argues that the trial court erred by instructing the jury, over his objections, on the law of the parties and self-defense.

## A. Standard of review

In analyzing a jury-charge issue, our first duty is to decide if there was error. *See Almanza v. State*, 686 S.W.2d 157, 174 (Tex. Crim. App. 1984); *Tottenham v. State*, 285 S.W.3d 19, 30 (Tex. App.—Houston [1st Dist.] 2009, pet. ref'd). Only if we find error do we consider whether an objection to the charge was made and analyze for harm. *Tottenham*, 285 S.W.3d at 30; *see Warner v. State*, 245 S.W.3d 458, 461 (Tex. Crim. App. 2008) ("The failure to preserve jury charge error is not a bar to appellate review, but rather it establishes the degree of harm necessary for reversal."). If the error was properly preserved, reversal is required if there is "some harm" to the defendant. *Almanza*, 686 S.W.2d at 171. However, if the error was not properly preserved, the error must be "fundamental," meaning that it was "so egregious and created such harm that the defendant 'has not had a fair and impartial trial.'" *Barrios v. State*, 283 S.W.3d 348, 350 (Tex. Crim. App. 2009) (quoting *Almanza*, 686 S.W.2d at 171).

## B. Law-of-parties instruction

"A person is criminally responsible as a party to an offense if the offense is committed by his own conduct, by the conduct of another for which he is criminally responsible, or by both." TEX. PENAL CODE ANN. § 7.01(a) (West 2011). A person is criminally responsible for the conduct of another if, while "acting with intent to promote or assist the commission of the offense, he solicits, encourages,

directs, aids, or attempts to aid the other person to commit the offense . . . ." *Id.* § 7.02(a)(2). "Each party to an offense may be charged with commission of the offense." *Id.* § 7.01(b). Therefore, under the law of parties, the State is able to enlarge a defendant's criminal responsibility to include acts in which he may not have been the principal actor. *Goff v. State*, 931 S.W.2d 537, 544 (Tex. Crim. App. 1996).

"In general, an instruction on the law of parties may be given to the jury whenever there is sufficient evidence to support a jury verdict that the defendant is criminally responsible under the law of parties." *Ladd v. State*, 3 S.W.3d 547, 564 (Tex. Crim. App. 1999). The law-of-parties instruction may be included in the charge—even if the indictment alleges only that the defendant acted as a principal actor—if evidence has been presented at trial to support the theory. *Marable v. State*, 85 S.W.3d 287, 288 (Tex. Crim. App. 2002) ("[I]t is well-settled that the law of parties need not be pled in the indictment."); *Hayes v. State*, 265 S.W.3d 673, 678–79 (Tex. App.—Houston [1st Dist.] 2008, pet. ref'd). To determine whether the evidence supports submission of the instruction, the trial court may consider evidence of events that occurred before, during, and after the commission of the crime. *Goff*, 931 S.W.2d at 545.

Ryser contends that a law-of-parties instruction is erroneous if there is sufficient evidence to allow a jury to convict the defendant as a principal actor. But

submission of one theory does not prohibit the submission of the other. *See Goff*, 931 S.W.2d at 545. Even if there is "strong" evidence to support a conviction of a defendant under the theory that he was the principal actor, so long as there also is evidence that would support the alternate theory that he acted as a party to the offense, the prosecution may submit both theories and the trial court may include a jury instruction on the law of parties. *Id.*; *Perry v. State*, 977 S.W.2d 847, 850 (Tex. App.—Houston [14th Dist.] 1998, no pet.).

The videotape evidence played for the jury shows a group of officers approach Holley, encircle him, and kick and stomp on him. As the video played for the jury, Ryser identified himself as one of the officers in the group and detailed his use of force during the arrest, which included four knee strikes and a "pop" to Holley's head with his knuckles.

Ryser testified that he did not give Holley any verbal commands during the arrest. Instead, he used force to assist the other officers to gain Holley's compliance with their verbal commands. He explained, "I was trying to cause pain so he would comply with the commands the other officers were giving him." Ryser testified that, at the time of the arrest, the other officers were just "blue blurs. They're not a threat to me, so I'm not paying attention to what they're doing." As he watched the arrest video from the witness stand, Ryser stated that there were "a lot of good examples of kicking on this video to look at," but he maintained that he

14

had not kicked Holley and was not aware that the other officers were doing so at the time.

Police Chief McClelland characterized the officers' actions as more coordinated, saying that "it just appears to me it's a group mentality and no one is doing what they're trained to do."

We also consider evidence of events that occurred after the arrest in determining whether the law-of-parties instruction was improper. *See Goff*, 931 S.W.2d at 545 (holding that reviewing court should consider evidence of events before, during, and after commission of crime to determine whether evidence supports submission of law-of-parties instruction). Houston Police Department Sergeant H. Sanchez, who prepared the arrest report, did not actually witness Holley or the other suspects being taken into custody; he was focused on recovering jewelry and other stolen items around the arrest scene. He testified that he asked the arresting officers at the scene whether it would be correct to include in the offense report that all of the burglary suspects were resisting arrest with "closed fists or kicking." According to Sergeant Sanchez, the arresting officers nodded and told him, "Yeah, you can say that." Sergeant Sanchez conceded at trial that it was "pretty obvious" from the videotape that Holley had not swung at the officers with his fists, contrary to the submitted report.

Sergeant Sanchez also testified about the police department's use-of-force guidelines, which require officers to supplement their offense reports any time they use force on a suspect or suspect is injured. Ryser testified that he was aware of that policy and likewise aware that his use force on Holley was sufficient to require him to submit a supplemental use-of-force report. Yet he testified that neither he nor any of the other officers involved in the arrest submitted supplemental reports to disclose that they had used force while arresting Holley. He stated that every officer in the group "forgot."

The evidence regarding the events during and after Holley's arrest, including the videotape, supports the submission of a law-of-parties instruction based on the State's alternative theory that Ryser intended to assist the other officers and encouraged or aided them in their unlawful mistreatment of Holley. Accordingly, the trial court did not err by including the law-of-parties instruction.

## C.    Self-defense instruction

Ryser next asserts that the trial court erred by including a self-defense instruction in the jury charge. The State counters that the self-defense instruction was included as a general instruction on the law applicable to the case and was necessary to present fully the law on law-enforcement justification.

### 1.    How the defenses raised at trial relate

Ryser was charged with official oppression based on an allegation that he used excessive force against Holley while arresting him. *See* TEX. PENAL CODE ANN. § 39.03(a)(1). Ryser raised, as a defense to his prosecution, the "law enforcement" justification defense and requested an instruction to the jury explaining that police officers are justified to use force to the degree the officer reasonably believes is immediately necessary to make an arrest. *Id.* § 9.51(a). The instruction was included in the charge.

In response, the State requested an instruction explaining to the jury that law enforcement's justification in use of force is not without limits. The State requested an instruction that criminal suspects are justified in their "use [of] force to resist an arrest" if, before offering any resistance, the police officer uses or attempts to use "greater force than necessary to make the arrest" and the suspect uses only the degree of force he "reasonably believes" to be "immediately necessary to protect himself" from that excessive force. *Id.* § 9.31(c); *see Daugherty*, 176 S.W.2d at 575 (stating that, "when aggression of the officer in making the arrest exceeds what is reasonably necessary to effect the arrest, the right of self-defense inures to the party assaulted."). The self-defense instruction—meaning Holley's use of self-defense against the arresting officers—also was included in the charge.

17

In this context, the law-enforcement justification defense was raised as a defense to prosecution, but the self-defense instruction was not. According to the State, the self-defense instruction was requested, not as a true defense but, instead, to instruct the jury correctly and fully on the law applicable to the case.

## 2.    The burden of proof when justification defenses are raised

Section 2.03 of the Penal Code sets forth the burden of proof for justification defenses raised as a "defense to prosecution." TEX. PENAL CODE ANN. § 2.03 (West 2011). It provides that, when evidence of a justification defense is admitted and that issue is submitted to the jury, the trial court is required to charge the jury that a reasonable doubt on the defensive issue will require that the defendant be acquitted. *See id.* This provision fixes the burden of proof on the State to prove every element of the offense, including disproving the justification defense. *See Assiter v. State*, 58 S.W.3d 743, 746 n.3 (Tex. App.—Amarillo 2000, no pet.) (explaining that burden of proof remains on State to prove every element of offense and to disprove any Chapter 9 justification defenses with proof beyond reasonable doubt (citing TEX. PENAL CODE ANN. §§ 2.03(d), 9.02 (West 2011))). A jury verdict of guilt is an implicit finding rejecting the defendant's justification defense. *Saxton v. State*, 804 S.W.2d 910, 914 (Tex. Crim. App. 1991).

Here, the justification defense raised by the defendant, Ryser, was the law-enforcement justification defense. TEX. PENAL CODE ANN. § 9.51(a). The State had

18

the burden to prove beyond a reasonable doubt that Ryser's actions did not qualify as a justification defense. *Assiter*, 58 S.W.3d at 746 n.3. The State sought to meet its burden by admitting the arrest videotape and arguing that Ryser's justification defense did not authorize the high degree of force observed because, to the extent Holley may have been resisting Ryser's actions, it would have been in self-defense and in direct response to the officers' excessive force. TEX. PENAL CODE ANN. § 9.31(c) (setting forth self-defense justification in context of resisting arrest). That was the State's burden to prove, and the jury's verdict of guilt carries with it an implied finding rejecting Ryser's defensive theory. *See Saxton*, 804 S.W.2d at 914.

### 3. Self-defense instruction necessary to properly instruct on law of the case

The trial court included in the charge the law-enforcement justification defense; therefore, it was required to charge the jury correctly on that issue. TEX. CODE CRIM. PROC. ANN. art. 36.14 (requiring trial court to deliver to jury written charge distinctly setting forth "law applicable to the case."); *Delgado v. State,* 235 S.W.3d 244, 249 (Tex. Crim. App. 2007) (holding that trial court is "ultimately responsible for the accuracy of the jury charge and accompanying instructions."). Because excessive force by the police can, in turn, justify a limited use of force by a criminal suspect in self-defense, an instruction was necessary to accurately set forth the law of the case regarding the law-enforcement justification defense. The

instruction also aided the jury in its evaluation of Ryser's testimony that a suspect cannot lawfully resist excessive force.[2]

### 4. Ryser's other arguments challenging the self-defense instruction

Beyond Ryser's general argument that the self-defense instruction should not have been included, he makes three specific arguments that the trial court erred in its instruction because (1) the self-defense instruction should have been submitted from the perspective of the defendant; (2) Holley did not testify at trial and there was no other "testimony" suggesting that Holley was acting in self-defense; and (3) the charge failed to include an application paragraph telling the jury to acquit Ryser if the burden of proof was not met on the issue of self-defense. We consider each of these arguments in turn.

### a. Submission of self-defense from another's perspective

Ryser argues that the law of self-defense must always be viewed from the standpoint of the defendant. Ryser relies on *Bradford v. Fort Worth Transit Company*, 450 S.W.2d 919, 922 (Tex. App.—Fort Worth 1970, writ ref'd n.r.e.), which states that, "[u]nder the law of self-defense it is basic that the attack be viewed from the standpoint of the defendant. This rule has long been followed in the criminal jurisprudence of the State of Texas." *Id.* But the appellate court goes on to explain that it would be incorrect to consider a claim of self-defense from the

---

[2] Sergeant Sanchez also testified that he believes suspects never have a legal right to resist arrest. Neither witness's testimony correctly states the law.

20

"viewpoint of the jury as they see it subsequent to the homicide. Defendant has a right to have his side submitted as he viewed it at the time of the transaction." *Id.* at 922–23.

*Bradford* does not establish an absolute rule that self-defense is relevant only from a defendant's perspective. Instead, the rule is that self-defense must be viewed from the relevant actor's perspective, taking into account his knowledge at the time he acted, and not the viewpoint of the jury that has the benefit of hindsight in evaluating whether the actor actually was in danger. *See id.* ("The question whether the killing was justifiable is not to be viewed in the light of later events, but by what the defendant reasonably believed at the time." (quoting 28 Tex. Jur. 2d § 26 at 669–672 (1961))). The actor whose law-enforcement justification was at issue in *Bradford* was the defendant, but here it was Holley. We conclude that *Bradford* does not support Ryser's argument.

### b.      Meeting burden without testimonial evidence

Next, Ryser argues that the "State cannot use the claim of self-defense when it has not been raised by the complainant himself" and testimonial evidence from Holley or another witness was required to meet the State's burden. In support of these arguments, Ryser relies on *VanBrackle v. State*, 179 S.W.3d 708 (Tex. App.—Austin 2005, no pet.).

21

In *VanBrackle*, the defendant—who did not testify—requested a jury instruction on self-defense, which was denied. *See id.* at 712–13. The State's position was that a self-defense instruction is not warranted when a defendant offers no evidence of his state of mind. *See id.* at 713. The appellate court held that any evidence that the actor was acting in self-defense—even weak evidence—warrants the submission of a self-defense instruction. *Id.* at 712. The court noted that there was evidence that the defendant responded to the aggression against him by "grabbing the pistol, pushing it away, and calling for help. This was an 'observable manifestation' of appellant's belief that it was necessary to defend himself . . . ." *Id.* at 713–14.

Here, the jury reasonably could have concluded that the videotape demonstrated an "observable manifestation" of Holley's belief that he needed to use self-defense against the police's excessive use of force. Thus, testimony from Holley regarding his state of mind was not required to meet the threshold for submitting the instruction.

### c. Application paragraph on self-defense issue

Ryser's last argument concerning the self-defense instruction is that the trial court was required to instruct the jurors that they "must acquit [Ryser] if they had a reasonable doubt on the issue of self-defense as required by [section] 2.03(d) of the Penal Code." He contends that "there should have been an application paragraph

instructing jurors on what to do if they believed [Holley] acted in self-defense. Without a proper application paragraph the inclusion of the jury instruction on self-defense was error."

Section 2.03(d) requires an instruction to the jury that it must acquit if it has a reasonable doubt of a justification defense asserted as a "defense to prosecution." *See* TEX. PENAL CODE ANN. §§ 2.03(a), (c) (establishing burden of proof if defense is submitted to jury); 9.02 ("It is a defense to prosecution that the conduct in question is justified under this chapter."); 9.51 ("A peace officer . . . is justified in using force against another when and to the degree the actor reasonably believes the force is immediately necessary to make or assist in making an arrest . . . ."); *see also Assiter*, 58 S.W.3d at 746 n.3 (explaining burden of proof on justification defenses). Therefore, the trial court was required to include in the charge an instruction that the jury must acquit Ryser if it has a reasonable doubt concerning *his* justification defense, i.e., the law-enforcement defense. The charge included the following instruction:

> Therefore, if you find and believe from the evidence beyond a reasonable doubt that . . . [Ryser] intentionally subject[ed] [Holley] to mistreatment that the defendant knew was unlawful . . . *but you further find from the evidence, or you have a reasonable doubt thereof, that [Ryser] reasonably believed that force was immediately necessary to make or assist in making an arrest . . . then you will acquit the defendant . . . .*

Thus, the paragraph setting forth the burden of proof on a justification defense, as required by section 2.03(d), was included.

Section 2.03(d) does not require a similar paragraph with regard to self-defense here because it is not a "justification defense" that was raised as a "defense to prosecution." What is required is that the additional instruction on self-defense not improperly relieve the State of its burden of proof. We conclude that it did not. The charge instructed the jury:

> [I]f you have a reasonable doubt as to whether or not the defendant was justified in using force on said occasion and under the circumstances, then you should give the defendant the benefit of that doubt and say by your verdict not guilty.

This language maintains the burden of proof on the State, consistent with the application paragraph quoted above, by instructing the jury that it should acquit if it has a reasonable doubt whether Ryser's use of force was justified.

Having overruled Ryser's contention of charge error with regard to the law-of-parties instruction and the self-defense instruction, we overrule his first issue.

### Change of Venue

In his second issue, Ryser contends that that the trial court abused its discretion in denying his motion to change venue because (1) there was strong evidence that he could not receive a fair trial in the venue and (2) the court used an erroneous legal standard by confusing the grounds for change of venue.

24

## A. Required showing for change of venue

Every defendant in a criminal case is guaranteed the due process of a fair trial by an impartial jury under the United States and Texas constitutions. U.S. CONST. amend. VI; TEX. CONST. art. I, § 10. A change in venue may be granted on a criminal defendant's motion if supported by the defendant's affidavit and the affidavits of two other credible residents of the county if, within the county, there is either (1) "so great a prejudice against [the defendant] that he cannot obtain a fair and impartial trial" or (2) "a dangerous combination against [the defendant] instigated by influential persons, by reason of which he cannot expect a fair trial." TEX. CODE CRIM. PROC. ANN. art. 31.03(a) (West 2006). The movant has the burden to establish either of these bases for a change of venue. *See DeBlanc v. State*, 799 S.W.2d 701, 704 (Tex. Crim. App. 1990).

Change of venue is a remedy designed to ensure the defendant a fair trial when extensive news coverage has raised substantial doubts about the effectiveness of voir dire for obtaining an impartial jury. *Beets v. State*, 767 S.W.2d 711, 742–43 (Tex. Crim. App. 1987). To justify a change of venue based on public attention sparked by media, a defendant must show that the "publicity was pervasive, prejudicial, and inflammatory." *Gonzalez v. State*, 222 S.W.3d 446, 449 (Tex. Crim. App. 2007); *Salazar v. State*, 38 S.W.3d 141, 150 (Tex. Crim. App. 2001). "The mere existence of media attention or publicity is not enough, by

25

itself, to merit a change of venue." *Gonzalez*, 222 S.W.3d at 449; *accord Renteria v. State*, 206 S.W.3d 689, 709 (Tex. Crim. App. 2006). Even extensive knowledge of the case in the community is not sufficient if there is not a showing of prejudicial or inflammatory coverage. *Gonzalez*, 222 S.W.3d at 449. The defendant "bears a heavy burden to prove the existence of such prejudice in the community that the likelihood of obtaining a fair and impartial jury is doubtful." *DeBlanc*, 799 S.W.2d at 704 (quoting *Nethery v. State*, 692 S.W.2d 686, 694 (Tex. Crim. App. 1985)).

To determine whether the publicity was inflammatory and prejudicial, the court can consider evidence presented at the change of venue hearing and statements made by venire members during voir dire if the trial court rules after the voir dire process. *Gonzalez*, 222 S.W.3d at 451. Factors a reviewing court may consider when a defendant appeals the denial of his venue motion include: (1) the nature of the pretrial publicity; (2) the connection of government officials with the publicity; (3) the length of time between the publicity and the trial; (4) the severity and notoriety of the offense; (5) the area from which the jury panel was to be drawn; and (6) any factors likely to affect the candor and veracity of the prospective jurors during voir dire. *See Gonzalez*, 222 S.W.3d at 448; *Henley*, 576 S.W.2d at 71–72.

**B.      Standard of review**

Denial of a change of venue request is reviewed under the abuse of discretion standard. *Gonzalez*, 222 S.W.3d at 449. We give great deference to the trial court, which is in the best position to resolve issues involving conflicts in testimony and to evaluate the credibility of the witnesses. *Id*. at 452; *Brooks*, 323 S.W.3d at 899. If the trial court does not make explicit findings of fact, a reviewing court will assume that the trial court made implicit findings of fact that support its ruling as long as those findings are supported by the record. *Montanez v. State*, 195 S.W.3d 101, 106 (Tex. Crim. App. 2006); *State v. Ross*, 32 S.W.3d 853, 855 (Tex. Crim. App. 2000). As long as the trial court's ruling is within the zone of reasonable disagreement, the trial court does not abuse its discretion in denying the venue motion. *See Gonzalez*, 222 S.W.3d at 449.

**C.      The trial court's decision is within the zone of reasonable disagreement**

There were 13 witnesses who testified at the officers' joint venue hearing. The witnesses included defense attorneys with high profile case experience, assistant district attorneys, jury consultants, and media experts, as well as prominent members of the community, including Houston Mayor Parker, Police Chief McClelland, and Quanell X.

Many witnesses testified that they did not believe that Ryser could receive a fair trial in Harris County. For example, defense attorney George Parnham spoke

27

of the mayor's and district attorney's initial efforts to prevent the videotape from being disseminated exactly because it might affect the officers' ability to obtain a fair trial. Parnham then opined that the subsequent release of the videotape to the news outlets removed any possibility of a fair trial in Harris County. Others concurred. Richard Haynes, another defense attorney, testified that the widespread display of the videotape "poison[ed] the atmosphere" so that Ryser could not get a fair and impartial jury.

Ryser also offered evidence that an online search produced 203 print stories about the incident, most of which contained the words "beating" or "brutality." He further claimed that there were 700,000 households that watch the local news stations, which were continually playing the arrest video.

On the other hand, Chief McClelland, Mayor Parker, Quanell X, and two Harris County assistant district attorneys all testified that Ryser could receive a fair trial in Harris County. Mayor Parker testified that the community reaction following the incident was much more focused on the general issue of police brutality and the city's efforts to ensure proper conduct than on the facts of this particular case or on these officers' pending charges. Further, it was noted that the hearing occurred two years after the video was released.

### 1.    Publicity that is pervasive, prejudicial, and inflammatory

Ryser first argues that the inflammatory and prejudicial nature of the coverage required a change in venue.

Because the videotape would be admitted as evidence and viewed by the jurors at trial, we cannot conclude that the earlier publication of the video was, by itself, so prejudicial and inflammatory that a change in venue would be required. *See Gonzalez*, 222 S.W.3d at 452. Jurors need not be "totally ignorant" of the facts of a particular case in order to hold a fair trial. *Renteria*, 206 S.W.3d at 709.

Furthermore, Mayor Parker, Chief McLelland, Quanell X, and two Harris County assistant district attorneys all unequivocally testified that Ryser could receive a fair trial in Harris County. Specifically, Mayor Parker testified, "It's actually been months since anybody has raised the issue of the tape or this particular incident." She said she had "been, frankly, surprised that it so quickly disappeared off the radar." Mayor Parker also testified that, within six months of the video airing, the issue had gone "stale" and was no longer a matter of public discourse in her opinion. The trial court was within its discretion to believe these witnesses' testimony. *See Renteria*, 206 S.W.3d at 709.

Regarding the reach of the publicity, there was testimony that the Houston Chronicle has a readership of 2.2 million and that the nightly news has a viewership of over 700,000 households in a 19-county viewing area. But, there was

29

a significant lapse of time between when the video aired on the news stations and when the members of the community were contacted to serve as potential jurors in this case—two years. *See Skilling v. U.S.*, 561 U.S. 358, 383, 130 S. Ct. 2896, 2916 (2010) (considering that four years had elapsed between media storm and trial in denying defendant's motion to change venue); *Stanley v. State*, 664 S.W.2d 746, 754 (Tex. App.—San Antonio 1983, writ ref'd) (finding significance in fact that publicity occurred over 30 months before trial). There was no expert testimony regarding media attention closer to the time of the venue hearing or more recent online traffic accessing the older news stories.

Finally, the trial was set to occur in Harris County—by any measure a large region with a diverse jury pool. *See Skilling*, 561 U.S. at 382, 130 S. Ct. at 2915. In *Skilling*, a high profile case with widespread media attention, the Supreme Court commented on this particular venue, stating that, "Houston . . . is the fourth most populous city in the Nation . . . . [M]ore than 4.5 million individuals eligible for jury duty reside[] in the Houston area. Given this large, diverse pool of potential jurors, the suggestion that 12 impartial individuals could not be empaneled is hard to sustain." *Id*. In denying Ryser's venue motion, the trial judge likewise commented that Harris County is larger than the populations of over 25 states in our country.

This court affords great deference to the trial court to determine venue motions. *See Gonzalez*, 222 S.W.3d at 452. "When pretrial publicity is at issue, 'primary reliance on the judgment of the trial court makes [especially] good sense' because the judge 'sits in the locale where the publicity is said to have had its effect' . . . ." *Skilling*, 561 U.S. at 386, 130 S. Ct. at 2918 (quoting *Mu'Min v. Virginia*, 500 U.S. 415, 427, 111 S. Ct. 1899, 1906 (1991)).

Based on the testimony of numerous witnesses that Ryser could receive a fair trial in Harris County, the length of time that had elapsed between the video airing and the trial, and the size of the county from which the jury would be empaneled, we conclude that the trial court's decision to deny the venue motion was within the zone of reasonable disagreement and, therefore, the trial court did not abuse its discretion in denying the motion based on Ryser's publicity argument. *See* TEX. CODE CRIM. PROC. ANN. art. 31.03(a) (setting standard for change of venue); *Gonzalez*, 222 S.W.3d at 449 (noting high standard for change of venue and deference given to trial court's ruling on matter).[3]

### 2. Dangerous combination

Ryser next complains that the trial court abused its discretion in denying his motion to change venue because there existed a "dangerous combination" of "media coverage and commentary by influential persons." The basis for sustaining

---

[3] The trial court granted the defendants' motion for individual voir dire. The individual jurors were found to be acceptable to the defense to serve on the jury.

a change of venue challenge based on a dangerous combination "comes not from a widely held prejudice but from the actions of a small but influential or powerful group who are likely to influence in some manner the way in which the trial proceeds." 42 Tex. Prac., Criminal Practice And Procedure § 30:11 (3d ed.); *see also Hussey v. State*, 590 S.W.2d 505, 506 (Tex. Crim. App. [Panel Op.] 1979).

In particular, Ryser references a press conference jointly held by the district attorney, mayor, and police chief. During this press conference, it was announced that Ryser and other officers were being charged with a crime arising from Holley's arrest and simultaneously were being terminated from employment with the HPD. Ryser contends that those conducting the press conference, as well as a number of other influential people, made inflammatory statements, including, for example, State Representative Garnet Coleman, who is quoted as saying:

> I'm appalled and deeply disturbed by the actions of the officers shown in the video. The kicking and stomping of a 15-year-old boy by these officers was brutal, unwarranted, and shameful. It is especially disturbing when those charged with keeping us safe so blatantly abuse their power and violate their trust. These individuals are not above the law and must be appropriately dealt with.

Ryser suggests that these individuals qualify as a "small but influential or powerful group" who had the ability to "influence in some manner the way in which the trial proceeds." At the hearing, defense witness Christopher Tritico, a criminal defense attorney, explained:

32

Well, look, it's one thing to have public officials come out and call for justice. All right? That's not piling on to that specific defendant. What we have here was instead of a call for justice, a call for calm, which we would expect from our leaders, we didn't have a call for calm, we didn't have a call for justice. We had a call for vengeance, in my view, from our public leaders. And that's why this case has been tainted in Harris County.

Tritico specifically referenced the mayor's statements, describing them as "caustic" and reflective of her belief "that the defendants should be tried and convicted."

Although we recognize that there was a combination of influential people who attended the initial press conference (the mayor, police chief, and district attorney), Ryser did not show that they acted in a way that amounted to a "dangerous combination" so that he could not "expect a fair trial." The mayor's statements that the community was no longer talking about the case and that it had been "off the radar" for many months before the trial began counsels against a view that influential people were acting to impede the fair-trial process. *Cf. Myers v. State*, 177 S.W. 1167, 1169 (Tex. Crim. App. 1915) (involving allegation that fast speed with which case moved from arrest to trial indicated dangerous combination but concluding that speed indicated only that leaders "acted promptly in what they considered the performance of their duty").

Further, while statements made at a news conference by community leaders may have influenced the views of some individual community members, there is

no indication that, in a venue the size of Harris County, the personal views expressed by these city officials created a coercive governmental force that could influence the trial proceedings to obtain a conviction without regard to Ryser's constitutional right to a fair and impartial jury. *Cf. Cortez v. State*, 69 S.W. 536, 538 (Tex. Crim. App. 1902) (concluding that a dangerous combination of influential persons existed where influential people contributed financially to hunt for and arrest defendant, no local attorney would agree to defend him but many volunteered to prosecute, and defendant had to be given additional physical protections due to fears of mob violence).

Finally, the primary evidence in this case was the videotape, which provided direct evidence of the amount of force used to arrest Holley as he lay prone on the ground. The jurors were able to assess that evidence themselves, untethered to the views others may have had when they first viewed the tape or sought indictments.

Thus, we conclude that the trial court did not abuse its discretion in concluding that Ryser failed to demonstrate that there was a dangerous combination against him led by influential persons from which he could not expect a fair trial. To the extent the evidence could have supported a contrary conclusion, we hold that the matter was within the zone of reasonable disagreement and, thus, within the trial court's discretion.

## D.  The trial court did not apply an erroneous legal standard

Ryser next contends that the trial court applied an erroneous legal standard in denying his venue motion "[b]y predicating denial of [his] motion to change venue on the lack of any statements from potential veniremen" that they were influenced by the publicity.

A trial court's failure to analyze or properly apply the law is an abuse of discretion and would support a reversal. *See Kniatt v. State*, 239 S.W.3d 910, 912–13 (Tex. App.—Waco 2007, no pet.). The proper method for a trial court to analyze whether publicity is pervasive is through a hearing on the motion to change venue and, if voir dire is held before the trial court rules, consideration of the venire members' voir dire statements. *Gonzalez*, 222 S.W.3d at 449. Here, the trial court held a venue hearing and ruled at the conclusion of that hearing. The voir dire occurred at a later date.

Ryser quotes a statement made by the trial judge when his venue motion was denied, in which the court notes that it did not hear from any potential venire members at the venue hearing. But Ryser overstates the significance of that statement. In context, the trial court explained that its conclusion to deny the venue motion was reached in light of all of the evidence presented at the two-day venue hearing, including the 13 witnesses who did testify (many of whom stating that Ryser could receive a fair trial) and the fact that Harris County is large and diverse.

35

The record does not support Ryser's conclusion that the trial court denied his motion under an erroneous legal standard that would have required venire members' input.

We conclude that Ryser has not established that the trial court employed an erroneous legal standard in analyzing his venue motion. *See Renteria*, 206 S.W.3d at 709 (concluding that various witnesses' testimony at hearing stating that appellant could receive fair trial supported court's denial of motion to change venue). Further, after denying the venue motion, the trial court granted Ryser's motion for individual voir dire. Thus, even without proving that the media coverage was pervasive, prejudicial, and inflammatory, Ryser was provided an opportunity to question any venire members who might state that they were aware of the pre-trial publicity, to inquire about the publicity's effect on their suitability to serve as jurors, and, if necessary, to raise the issue again if the venire members' answers indicate that publicity tainted the jury pool.

We overrule Ryser's second issue.

## Sleeping Juror

In his third issue, Ryser argues that he was denied due process when the trial court refused to dismiss a "sleeping juror" or grant his motion for mistrial on that basis.

On the second day of trial, Ryser informed the trial court that one of the jurors appeared to be asleep "most, if not all, of the day." The trial court interviewed the juror on the record, outside the presence of the other jurors. She stated that she was not sleeping, that she "thought [she] was paying good attention," and that she has a "tendency" to look down but that she is listening and will try to "look more up, I guess." She explained that she often looks down in church as well, but she is listening. The juror confirmed that she did "understand this is important" and that those involved in the trial "don't want to have to redo it all over again . . . ." Defense counsel was allowed to call the bailiff to testify about his conversation with other jurors on the issue. He testified that three jurors told him that the juror was sleeping.

Ryser later moved to have the juror dismissed. That motion was denied. Ryser moved for a mistrial, which also was denied. Ryser did not move for a mistrial again over the course of the week-long trial.

## A. Standard of review

We review a trial court's denial of a motion for mistrial for an abuse of discretion. *Ladd*, 3 S.W.3d at 567. A mistrial is an appropriate remedy in "extreme circumstances" for a narrow class of highly prejudicial and incurable errors. *Ocon v. State*, 284 S.W.3d 880, 884 (Tex. Crim. App. 2009). Whether an error requires a mistrial must be determined by the particular facts of the case. *Ladd*, 3 S.W.3d at

37

567. The movant has the burden of proving the allegation of juror misconduct. *See Hughes v. State*, 24 S.W.3d 833, 842 (Tex. Crim. App. 2000). "The trial court should consider whether 'the sleeping juror missed large portions of the trial or [whether] the portions missed were particularly critical." *Menard v. State*, 193 S.W.3d 55, 60 (Tex. App.—Houston [1st Dist.] 2006, pet. ref'd) (quoting *United States v. Freitag*, 230 F.3d 1019, 1023 (7th Cir. 2000)). "However, a court is not invariably required to remove sleeping jurors, and a court has considerable discretion in deciding how to handle a sleeping juror." *Id.* (quoting *Freitag*, 230 F.3d at 1023).

An appellate court views the evidence in the light most favorable to the trial court's ruling. *Webb v. State*, 232 S.W.3d 109, 112 (Tex. Crim. App. 2007). The ruling must be upheld if it was within the zone of reasonable disagreement. *Id.* When reviewing the denial of a motion for mistrial, determinations of historical fact and assessments of witness credibility are left almost entirely to the discretion of the trial judge; when there is conflicting evidence, there is no abuse of discretion if the motion is overruled. *Hughes*, 24 S.W.3d at 842.

**B.      The trial court did not abuse its discretion**

The juror expressly denied, on the record, that she had been sleeping. She explained that she lowers her head often but that she is continuing to listen and pay attention. She confirmed that she understood the importance of the proceeding

and that she would, if needed, raise her head more often. The trial judge found the juror's testimony credible, explaining:

> I talked to the juror and the juror has assured me she's paying attention. That's the way she pays attention in church as well. She said although she does tend to put her head down, but it doesn't mean she's sleeping. She's paying attention. She gave her assurance to me.

The trial judge was in the courtroom; he could observe the juror's behavior and determine her credibility. We hold that the trial court was within its discretion to believe the juror's testimony and, therefore, did not abuse its discretion by denying the motion for mistrial on this basis. *See Hughes*, 24 S.W.3d at 842.

We overrule Ryser's third issue.

## Denial of Motion for New Trial

In his fourth issue, Ryser contends that the trial court erred by denying his motion for new trial. He moved for a new trial based on the allegation that one of the jurors engaged in misconduct by allowing an outside influence to alter jury deliberations. Specifically he contended that a juror looked up the term "mistreatment" in the dictionary before the second day of jury deliberations began and shared that definition with other jurors as they deliberated. He also contended that the same juror reassured the other jurors that Ryser had a new job, had moved on with his life, and would, in effect, "bounce back."

The affidavits of four of the jurors, including the one who looked up the term "mistreatment," were submitted to the trial court. One of the jurors averred

39

that the definition of "mistreatment" that was brought into the jury room included the terms "roughly" and "wrongly." The juror who looked up the term admitted in his affidavit that he wrote down some definitions of "mistreatment" from a Webster's Dictionary and shared them with the other jurors. The two other juror affidavits confirm that this occurred. Following a hearing on the motion, the trial court denied Ryser's motion for new trial. Ryser asserts on appeal that the trial court erred in denying his new-trial motion based on his contention that a juror presented a definition of misconduct to the jurors during jury deliberation. [4]

## A. Standard of review

To warrant a new trial based on jury misconduct, the movant must establish not only that jury misconduct occurred, but also that it was material and probably caused injury. *Bogue v. State*, 204 S.W.3d 828, 829 (Tex. App.—Texarkana 2006, pet. ref'd).

The trial court's denial of a motion for new trial is reviewed under an abuse of discretion standard. *McQuarrie v. State*, 380 S.W.3d 145, 150 (Tex. Crim. App.

---

[4] All other allegations of misconduct were contested, including that one of the jurors said Ryser had moved on with his life. The trial court does not abuse its discretion in denying a motion for new trial based on allegations that are disputed where the resolution of the new-trial motion requires consideration of witness credibility. *Thomas v. State*, 699 S.W.2d 845, 854 (Tex. Crim. App. 1985) ("Where there is conflicting evidence on an issue of fact as to jury misconduct the trial judge determines the issue and there is no abuse of discretion in overruling the motion for new trial.").

2012); *Salazar*, 38 S.W.3d at 148. We do not substitute our judgment for that of the trial court, but simply determine whether the trial court's decision was arbitrary or unreasonable. *See Salazar*, 38 S.W.3d at 148; *Holden v. State*, 201 S.W.3d 761, 763 (Tex. Crim. App. 2006). The trial court is the sole judge of the credibility of witnesses. *Salazar*, 38 S.W.3d at 148. "Where there is conflicting evidence on an issue of fact as to jury misconduct, the trial judge determines the issue and there is no abuse of discretion in overruling the motion for new trial." *Id.* A trial court abuses its discretion in denying a motion for new trial only if no reasonable view of the record could support the trial court's ruling. *McQuarrie*, 380 S.W.3d at 150; *Holden*, 201 S.W.3d at 763.

## B.    Outside influence

With regard to an allegation of juror misconduct, Rule 606(b) allows a juror to testify on whether "any outside influence was improperly brought to bear upon any juror." TEX. R. EVID. 606(b). However, a juror may not testify as to any matter or statement occurring during the jury's deliberations, the effect the matter had on any juror's mind or mental process, or how the matter influenced the juror's decision-making.[5] *See McQuarrie*, 380 S.W.3d at 153–54. Thus, when testifying

---

[5]    The Texas Court of Criminal Appeals explained this prohibition against "delving into deliberations" as an effort to keep jury deliberations "private to encourage jurors to candidly discuss the law and the facts." *McQuarrie*, 380 S.W.3d at 154. Further, the effect of Rule 606 is to "limit 'the role jurors may play in attacking

41

about outside influences, a juror's testimony will be limited to "that which occurs outside of the jury room and outside of the juror's personal knowledge and experience," meaning information that "originates from sources other than the jurors themselves." *See id.* at 151, 153 (quoting *Golden Eagle Archery, Inc. v. Jackson*, 24 S.W.3d 362, 370 (Tex. 2000)).

Until 2012, the prevailing view in Texas was that the phrase "outside influence" did not include "anything that is communicated to the jury by one of the jurors, regardless of the origin of that information." *See McQuarrie*, 380 S.W.3d at 151. Under this view, Rule 606 would prevent a juror from testifying that another juror injected outside information if that information was communicated to the jurors by one of their own. *See id.* But the Texas Court of Criminal Appeals altered this view with its holding in *McQuarrie*, 380 S.W.3d at 154.

In *McQuarrie*, a defendant who had been convicted of sexual assault moved for a new trial based on juror misconduct. *See id.* at 148–49. The defendant alleged that one of the jurors had done independent research on the effects of date rape drugs. *See id.* at 148. After the trial court denied the defendant's motion for new trial, the court of appeals affirmed, holding that the information was not an outside influence because it was introduced to the jurors by another juror. *McQuarrie v.*

the validity of a verdict.'" *Colyer v. State*, 428 S.W.3d 117, 123–24 (Tex. Crim. App. 2014).

*State*, No. 13-09-00233-CR, 2011 WL 1442335, at *6 (Tex. App.—Corpus Christi 2011) (mem. op., no designated for publication), *rev'd*, 380 S.W.3d 145 (Tex. Crim. App. 2012).

The Court of Criminal Appeals held that the definition of an "outside influence" used by the court of appeals was overly narrow, undermined Rule 606(b)'s stated exception allowing jurors to testify about outside influences that are improperly brought to bear, and could lead to absurd results. *McQuarrie*, 380 S.W.3d at 151–52. The Court emphasized that juries are only to "use the law, the evidence, and the trial court's mandates as [its] ultimate guides in arriving at decisions as to guilt or innocence and as to punishment." *Id.* at 153 (quoting *Granados v. State*, 85 S.W.3d 217, 235 (Tex. Crim. App. 2002)).

Using the "plain-meaning interpretation" of the term "outside influence," the Court held that research on the effects of date rape drugs in a sexual assault trial was an outside influence:

> The internet research occurred outside of the jury room and outside of deliberations—the juror conducted a private investigation at her home during an overnight break. In addition, the information obtained originated from a source on the internet, a source other than the jurors themselves. The internet research constituted an "outside influence."

*Id.* at 154.

Here, the juror admitted that he consulted "Webster's Dictionary," obtained definitions of a term contained in the jury charge from that dictionary, and shared

that information with the jury during deliberations. We conclude that the definitions were an "outside influence," as that term is now understood in light of *McQuarrie.*

## C. Harm analysis

Outside influences do not result in automatic reversals. "An 'outside influence' is problematic only if it has the effect of *improperly* affecting a juror's verdict in a particular manner—for or against a particular party." *Colyer*, 428 S.W.3d at 129. Consistent with the mandate that we not "delve into [jury] deliberations," we review the possible harm caused by the outside influence using an objective, "hypothetical average juror" standard, without consideration of the actual effect that the influence had on these particular jurors. *McQuarrie*, 380 S.W.3d at 153–54.

Thus, the question before us is whether—given that the juror consulted a dictionary to obtain definitions of the term "mistreatment" and then shared those definitions with the deliberating jury the next day—there is a "reasonable possibility that it had a prejudicial effect" by impacting the verdict, which we answer using the objective standard of a hypothetical average juror. *Id.* at 154.

Until recently, Texas courts have not reached the point of analyzing harm in connection with a juror's reference to a dictionary because, until *McQuarrie*, doing so was not considered an "outside influence." Many other jurisdictions, though,

have long held that referring to a reference book is an outside influence and, thus, have analyzed when doing so can be considered prejudicial. *See, generally*, Jean E. Maess, Annotation, *Prejudicial Effect of Jury's Procurement or Use of Book During Deliberation in Criminal Cases*, 35 A.L.R.4TH 626 (1985) (accumulating cases from many jurisdictions on issue). Courts distinguish between a jury's use of standard dictionaries and more specialized references such as legal dictionaries or law books in determining whether a defendant is prejudiced by the use of outside reference materials. *See id.* This is because the danger in a juror's use of a reference book is that the jury will use it "to construct their own definitions of *legal terms* which do not accurately or fairly reflect applicable law." *United States v. Birges*, 723 F.2d 666, 671 (9th Cir. 1984) (emphasis added). But that danger is greatly reduced when the word is one taken as a matter of common knowledge which the jury is supposed to possess. *State v. Cummings*, 576 P.2d 36, 37–38 (Or. Ct. App. 1978).

Thus, when a juror refers to a dictionary and encounters a "fairly innocuous" definition that neither conflicts with the legal concepts included in the jury instructions nor contradicts any other aspect of the jury charge, courts have generally found the jury misconduct to be harmless. *See, e.g.*, *State v. Tinius*, 527 N.W.2d 414, 417 (Iowa Ct. App. 1994) (stating that dictionary definition "was fairly innocuous"); *State v. Melton*, 692 P.2d 45, 49 (N.M. Ct. App. 1984) (noting

45

that definitions of words "control," "keep," and "possess" that juror found in dictionary "did not vary from the usual ordinary meaning of those words, or from the meaning contained in the trial court's instructions.").

In cases in which a juror looked up a legal term and the dictionary definition did conflict with the jury charge, prejudice has more readily been found. *See, e.g.*, *Alvarez v. People*, 653 P.2d 1127, 1130–31 (Colo. 1982) (where juror looked up terms "reasonable," "imaginary," and "vague," to evaluate whether State met burden of "beyond reasonable doubt," court found jury misconduct was prejudicial); *Marino v. Vasquez*, 812 F.2d 499, 502, 505 (9th Cir. 1987) (definition of "malice" found in dictionary, defined as "active or vindictive ill-will," differed greatly from definition of malice included in court's charge, could have resulted in guilty verdict based on "ill-will alone," and was prejudicial).

Ryser was charged with official oppression, which was defined for the jury as follows:

> Our law provides that a public servant acting under color of his office or employment commits the offense of official oppression if he intentionally subjects another to mistreatment that he knows is unlawful.

That language is consistent with the language in the statute criminalizing official misconduct. TEX. PENAL CODE ANN. § 39.03(a). The statute does not define the term "mistreatment," and neither did the jury charge. Thus, the jury was to use the

ordinary meaning of the term—not a special legal definition—and that definition was found in the dictionary used by the juror.

"When words are not specially defined by the Legislature, they are to be understood as ordinary usage allows, and jurors may freely read the statutory language to have *any* meaning which is acceptable in common speech." *Teer v. State*, 923 S.W.2d 11, 19 (Tex. Crim. App. 1996); *see* TEX. CODE CRIM. PROC. ANN. art. 3.01 (West 2005) ("All words, phrases and terms used in this Code are to be taken and understood in their usual acceptation in common language, except where specially defined."); TEX. GOV'T CODE ANN. § 311.011(a) (West 2013) ("Words and phrases shall be read in context and construed according to the rules of grammar and common usage.").

Instead of a definition, the jury charge provided four variations of mistreatment for the jury to consider. The charge asked whether the jury found from the evidence beyond a reasonable doubt that Ryser subjected Holley to "mistreatment that the defendant knew was unlawful" by (1) "kneeing Holley," (2) "striking Holley with his hands," (3) "pushing Holley's head with his hands," or (4) "kicking Holley with his foot."

The juror referenced a general-use dictionary and found the term "mistreatment" defined as acting "roughly" or "wrongly." That definition was compatible with the commonly understood meaning of the word and did not

47

conflict with the trial court's instructions. Even if a hypothetical average juror would have applied the dictionary definitions to read "mistreatment" as "wrongly [or] roughly," the jury charge still required that the juror find that the State proved, beyond a reasonable doubt, that Ryser kneed, struck, pushed, or kicked Holley, that that action was unlawful, and that Ryser intentionally engaged in such conduct. By requiring that Ryser acted intentionally and that he knew his conduct was unlawful, the jury charge placed additional requirements for conviction beyond a mere conclusion that Ryser acted "wrongly [or] roughly." Given these other required elements of the offense, Ryser has not demonstrated how application of these dictionary definitions was harmful.

Regarding the trial court's denial of Ryser's new-trial motion, we will conclude that the trial court abused its discretion in denying a new trial only if no reasonable view of the record could support the trial court's ruling. *McQuarrie*, 380 S.W.3d at 150; *Holden*, 201 S.W.3d at 763. Ryser has not met that burden here. He has failed to show how reference to the dictionary prejudiced him. To the extent it did at all, it was within the zone of reasonable disagreement and, therefore, within the trial court's discretion to deny the new trial. *See McQuarrie*, 380 S.W.3d at 150.

Accordingly, we overrule Ryser's fourth issue.

48

## Cumulative Error

In his sixth and final issue, Ryser contends that the combination of errors that occurred in his trial resulted in cumulative error that denied him due process. Because we have concluded that there was no error, there can be no cumulative error or harm. *See Chamberlain v. State*, 998 S.W.2d 230, 238 (Tex. Crim. App. 1999) ("It is conceivable that a number of errors may be found harmful in their cumulative effect. But, we are aware of no authority holding that non-errors may in their cumulative effect cause error.").

We overrule issue six.

## Conclusion

Having overruled all six of Ryser's issues, we affirm the judgment of the trial court.

Harvey Brown
Justice

Panel consists of Justices Massengale, Brown, and Huddle.

Publish.  TEX. R. APP. P. 47.2(b).